Darryl Wayne MORGAN, Appellant,

v.

COMMONWEALTH OF KENTUCKY, Appellee.

No. 2003–SC–0489–MR.

Supreme Court of Kentucky.

Jan. 19, 2006.

As Corrected Jan. 25, 2006.

As Modified May 3, 2006.

As Modified on Denial of Rehearing May 18, 2006.

Emily Holt Rohrer, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, Tami Allen Stetler, Assistant Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

Appellant, Darryl W. Morgan, was convicted in the Ballard Circuit Court of first-degree burglary, second-degree stalking, two counts of kidnapping, first-degree sexual abuse, terroristic threatening, and first-degree criminal trespass. He was sentenced to a total of thirty-five years imprisonment and appeals to this Court as a matter of right. For the reasons hereafter set out, we affirm all of Appellants convictions, except the conviction for second degree stalking, which we hereby reverse and remand for entry of an amended judgment of conviction and resentencing order consistent herewith.

## FACTS

The bulk of the charges against appellant stem from Morgan's actions on the night of October 2nd, and the early morning of October 3rd, 2002, wherein Morgan broke into the home of D.C. and essentially terrorized and victimized D.C. and her guest M.S.

Around 10:30 p.m. on October 2, 2002, Morgan went to the residence of D.C. in Barlow, Kentucky. Morgan, who admits to being a voyeur, watched through the bedroom window of D.C.'s trailer and observed her and her boyfriend, M.S., having sexual intercourse. After the couple went to sleep, Morgan lingered outside the trailer for several hours before cutting the telephone line and a window screen and going inside.[1] He then awoke the couple, and ordered them onto their stomachs.

Morgan, then armed with her son's shotgun and knife, repeatedly told the victims throughout the ordeal that if they did not do exactly as he told them, he would blow both of their heads off and bum the trailer down around them. When asked how he had gotten the gun, he replied he had been in her house numerous times and knew where everything was. He also boasted he had been in hundreds of houses in Ballard County.

Initially, Morgan ordered D.C. to get out from underneath the covers. When she cried and asked him not to make her, he put the gun up to M.S.'s head and said to do what he said or he would shoot M.S. D.C. eventually complied with Morgan's demands.

Later, Morgan asked D.C. if she had any painkillers or any alcoholic beverages. All she had was some tea. He then allowed her to put on her robe and bring him some tea and Tylenol. However, he kept his gun on M.S. When she returned, and after tying M.S.'s hands behind his back, Morgan told her to take her robe off. When she cried, he again put the gun to M.S.'s head.

Morgan told the couple that he only wanted to see D.C. naked and that no one would get hurt if they listened to him. He then told D.C. to get her vibrator out of her dresser drawer. When she denied owning a vibrator, he boasted he had been in her house before and knew she owned one. When she cried and asked him not to make her, he again put the gun up to M.S.'s head and said to do what he said or he would shoot M.S. However, when D.C. went to her dresser to get the vibrator out of the drawer, she dialed 911 from a phone on the dresser. According to the 911-dispatch log, the call from the D.C.'s residence came in at 2:44 a.m. The 911 dispatcher immediately sent officers to the trailer.

Subsequently, Morgan forced D.C. to sexually touch herself with her vibrator, threatening to shoot M.S. if she did not cooperate. As D.C. complied, Morgan rubbed her foot and leg.

Several minutes into the ordeal, a car drove up to the trailer. Morgan told D.C. to answer the door and get rid of whoever it was. It was Barlow City Police Chief Tony Hall, who then pulled D.C. out the front door of the trailer after she whispered the intruder had a weapon. Appellant then fled the premises and was later arrested.

## PEREMPTORY CHALLENGE

█ Morgan's first claim of error concerns the trial court's refusal to remove Juror 19 for cause. Morgan alleges that this was prejudicial to him under *Thomas*

---

[1] Apparently he only cut the phone line to the kitchen, not the one in D.C.'s bedroom.

*v. Commonwealth*[2] as he was required to use a peremptory strike to remove Juror 19.

During voir dire, Juror 19 disclosed that he was good friends with D.C.'s ex-husband, J.C., and that as a result, he had heard a great deal about the crimes from J.C., who in turn had heard the details directly from D.C. When asked whether he could find Morgan not guilty if the Commonwealth failed to prove its case, Juror 19 responded, "I would feel like I was betraying [J.C.] maybe," and told defense counsel that he "probably wouldn't be your best choice." Several questions later, Juror 19 stated that based on what he had read and heard he thought the case was "open and shut." When asked by the trial court whether he could render a fair verdict based solely upon the evidence presented, Juror 19 further replied, "Maybe I should not ... I would like to think I could, but I have formed a pretty strong opinion, but I don't know him. I would like to hear his side of it actually." Nonetheless, after repeated questions by the Commonwealth and trial court, Juror 19 finally said, "Well, I hope I can [make a decision strictly based on the evidence and the law]. I think I can, yeah."

A trial court's decision as to whether to excuse a juror for cause is reviewed for abuse of discretion. *Adkins v. Commonwealth*[3]; *Pendleton v. Commonwealth*[4]. "It is the probability of bias or prejudice that is determinative in ruling on a challenge for cause." *Pennington v. Commonwealth*[5]. The Commonwealth contends that removal for cause was not warranted because, despite Juror 19's prior comments, he eventually stated that he could decide the case based on the law and evidence presented. However, in *Montgomery v. Commonwealth*[6], we noted:

One of the myths arising from the folklore surrounding jury selection is that a juror who has made answers which would otherwise disqualify him by reason of bias or prejudice may be rehabilitated by being asked whether he can put aside his personal knowledge, his views, or those sentiments and opinions he has already, and decide the case instead based solely on the evidence presented in court and the court's instructions. Thus has come to be referred to in the vernacular as the "magic question." But, as Chief Justice Hughes observed in *United States v. Wood*, 299 U.S. 123, 146, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936), "[i]mpartiality is not a technical conception. It is a state of mind." A trial court's decision whether a juror possessed "this mental attitude of appropriate indifference" must be reviewed in the totality of the circumstances. It is not limited to the juror's response to a "magic question."

Juror 19's answers during voir dire established an inference of bias so pervasive that his eventual assertion that he could put aside his knowledge and preconceived opinions of the case simply did not rehabilitate him within the standard for a fair and impartial jury as guaranteed by the United States and Kentucky Constitutions. Concedingly, the trial court abused its discretion in not striking Juror 19 for cause.

**However, Juror 19 never sat on the jury that convicted Morgan,** because Morgan used one of his eight (8) peremptory challenges allotted to him for the very

**2.** 864 S.W.2d 252 (Ky.1993).

**3.** 96 S.W.3d 779 (Ky.2003).

**4.** 83 S.W.3d 522 (Ky.2002).

**5.** 316 S.W.2d 221, 224 (Ky.1958).

**6.** 819 S.W.2d 713, 717–18 (Ky.1991).

purpose for which they were granted—to strike a juror he felt would not be sympathetic to his cause.[7] To be clear, one should not believe this is a case where an obviously biased juror sat on the trial jury.

Morgan claims the use of his peremptory challenge in this circumstance resulted in a violation of a "substantial right" and thus requires reversal under *Thomas.*[8]

■ Under federal constitutional law, peremptory challenges are "auxiliary" and not of constitutional dimension.[9] Rather, they are a means to achieve the constitutionally required end of an impartial jury.[10] By *Thomas,* however, Kentucky elevated the peremptory challenge to that of a "substantial right" requiring the highest degree of protection, even though our history acknowledges we can freely add to them, subtract from them or take them away.[11]

Historically, the number of peremptory challenges has fluctuated for both the defense and the Commonwealth. In 1877, the defense was allowed twenty (20) peremptory challenges. The number was reduced to fifteen (15) in 1893; and to eight (8) in 1978. All during these periods, the Commonwealth was allowed only five (5) peremptory challenges.[12] In 1994, RCr 9.40 was amended to allow both the defense and the Commonwealth an equal number, eight (8) peremptory challenges each.[13] **If the peremptory challenge was intended to be a substantial right afforded to the defendant, as** *Thomas*

**holds, we suspect amendments as drastic as those made to RCr 9.40 would never have been allowed to stand.**

Black's Law Dictionary defines a substantial right as one which is essential and that potentially affects the outcome of a lawsuit and is capable of legal enforcement and protection, **as distinguished from a mere technical or procedural right.**[14] Conversely, a procedural right is derived from a legal or administrative procedure; a right that helps in the protection or enforcement of a substantial right.[15] This case illustrates the quintessential exercise of the peremptory challenge. Morgan's peremptory challenge allowed him to receive a fair and impartial jury; yet its use is now argued under *Thomas* as the basis for reversing the verdict of that fair and impartial jury.

As Justice Keller charged in his dissenting opinion in *Stopher v. Commonwealth,* "bestowing a substantial right upon the exercise of a peremptory challenge serves one function and one function only —— it manufactures reversible error in cases where the case has been decided by a fair and impartial jury."[16]

Morgan is now finding error where no error should exist. And again, *Thomas* upsets a verdict rendered by a fair and impartial jury **only because the Fifth and Sixth Amendment safeguards worked.** RCr 9.40 is something we created and we

---

7. RCr. 9.40.

8. *Id.*

9. *United States v. Martinez–Salazar,* 528 U.S. 304, 311, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), citing *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

10. *Id.* at 307, 120 S.Ct. 774.

11. *Stopher v. Commonwealth,* 57 S.W.3d 787, 813–814 (Ky.2001) (Keller, J., dissenting).

12. As was the case here.

13. *Id.*

14. 1324 (7th ed.1999) (emphasis added).

15. Id. at 1323.

16. 57 S.W.3d 787 (Ky.2001).

allow to exist. It is not and never·has been of constitutional status, except for our decision in *Thomas.* ·

Ours is an adversarial system where all parties work together to insure a fair and impartial jury. When that is done and a fair and impartial jury is seated, we should not disturb the verdict for that reason. As Justice Wintesheimer, in his dissent in *Thomas*, pointed out, "The mere fact that the defendant exercised all his peremptory challenges does not provide a sound basis for asserting that the process relating to challenges for cause automatically deprived him of a proper number of peremptory challenges." [17]

Morgan used his peremptory challenges to make sure that a fair and impartial jury decided his case, as was in his best interest to do. To suggest otherwise is an acknowledgment that one party has the right to a jury that favors his or her side. Many have said change *Thomas* or change RCr 9.40. One or the other is not working. We now join the chorus—it is time to overrule *Thomas.* And we do.

Having departed from *Thomas*, we admit the reversal therein was proper. We would again be compelled to join in such a reasonable opinion under those facts, but only for the proper grounds as were pointed out in Justice Leibson's concurring opinion thereto. There, Justice Leibson noted, the "death ... was front-page news in the local newspaper, the 'Troublesome Creek Times, ... ' " Prior to trial, Thomas moved for a change of venue, attaching seven news articles from the newspaper. The motion was denied, renewed after voir dire and denied again.

**Voir dire in *Thomas* revealed that 65 of 67 prospective jurors who were questioned on the record were knowledgeable about the case.** "Of the 67 prospective jurors, the trial court struck 24 for cause when they admitted they could not be fair, or expressed an opinion based on pre-trial publicity. Defense counsel unsuccessfully moved to strike ten more jurors for cause on grounds that they admitted they had read the details of this case in the paper." [18] There was, indeed, an abuse of discretion by the trial court in *Thomas* ..., but the abuse was the failure to grant a change of venue. And, to the extent inconsistent with this opinion, *Thomas* is hereby overruled.

Justice Cooper, in his dissent hereto, conjures up a scene where a less than scrupulous judge intentionally allows a jury to be "stacked" in favor of one party over the other and goes on to suggest that our decision sets the stage for such activities. On the contrary, this majority relies on the credibility of trial judges, as the backbone of our judicial system, to operate according to the law and the facts of the particular case with which they are dealing. We give great deference to the decisions of trial judges because we rely on their adherence to the law and to the oath of office administered to them according to the Constitution of this Commonwealth. *See Harris v. Commonwealth;* [19] *Commonwealth v. Deloney;* [20] *Commonwealth Transportation Cabinet Dept. of Highways v. Taub;* [21] *Commonwealth v. Walker.* [22]

In any scenario such as the one suggested by Justice Cooper, there are means for

17. *Id.* at 265.

18. *Thomas* at 261.

19. 134 S.W.3d 603 (Ky.2004).

20. 20 S.W.3d 471 (Ky.2000).

21. 766 S.W.2d 49 (Ky.1988).

22. 729 S.W.2d 440 (Ky.1987).

dealing with such conduct. This case deals with the facts before us and involves one juror and one peremptory strike. There is no evidence in this case to suggest any favoritism for the Commonwealth's position over Morgan's and no one has suggested otherwise. And were it otherwise, we would rule appropriately. It is simply not appropriate for our ruling today to be based upon facts not before us.

In *Thomas,* the Commonwealth relied on *Turpin v. Commonwealth*[23] *and Dunbar v. Commonwealth,*[24] to dispute the contention of a constitutional violation with respect to the use of peremptory challenges. *Dunbar* held:

> A defendant's right to be tried by an impartial jury is infringed only if an unqualified juror participates in the decision. *Rigsby v. Commonwealth,* 495 S.W.2d 795 (Ky.1973); *Randolph v. Commonwealth,* 716 S.W.2d 253 (Ky. 1986); *Sanborn v. Commonwealth,* 754 S.W.2d 534 (Ky.1988). As long as the jury that actually hears and decides the case is impartial, there is no constitutional violation. Even if a juror should have been removed for cause, such error does not violate the constitutional right to an impartial jury if the person did not actually sit on the jury. *Cf. Turpin v. Commonwealth,* 780 S.W.2d 619 (Ky. 1989); *Cf. Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

*Dunbar* at 854–55. The decision in *Thomas* abrogated the holdings in *Turpin* and *Dunbar.* This is a case where the evidence of the Defendant's guilt and abhorrent conduct are overwhelming. To retry this case under the sole dictates of *Thomas* would be absurd.

Thus we find no error in Morgan's trial in this regard. The error of the court in failing to strike Juror 19 for cause was harmless since he did not play a part in Morgan's conviction.

## *BATSON* CHALLENGE

Morgan next alleges the Commonwealth violated *Batson v. Kentucky,*[25] and *J.E.B. v. Alabama,*[26] when it exercised all of its peremptory challenges on male prospective jurors. We have reviewed the Commonwealth's grounds for striking each juror and conclude that it proffered sufficient gender-neutral explanations for the challenges. No error occurred.

## SHERIFF COOPER'S TESTIMONY

■ Morgan argues he was prejudiced by Sheriff Todd Cooper's reference to the camouflage bag and its contents as a "rape kit." We disagree. The "bag and its contents" were admitted into evidence without objection. Thus its contents were subject to fair comment.

No evidence of rape was presented to the jury as this was not, in fact, a rape case. The jury knew this within the context of the evidence it heard. No one ever suggested Morgan raped anyone.

Moreover, Sheriff Cooper was thoroughly cross-examined in the presence of the jury by Morgan's counsel regarding the contents of the bag, as well as other possible explanations for a bag containing these items. Testimony as to the bag, as well as the contents, was appropriate and the jury was allowed to conduct its duties as pre-

**23.** 780 S.W.2d 619 (Ky.1989).

**24.** 809 S.W.2d 852 (Ky.1991).

**25.** 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**26.** 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

scribed to it—to weigh the evidence presented and reach a verdict. We find no error in this mischaracterization of the contents of the bag. If anything, the use of "rape kit" was harmless error as we find there is no reasonable possibility that this mischaracterization might have contributed to Morgan's conviction.[27]

## DC'S TESTIMONY

On direct examination, D.C. testified that during her ordeal with Morgan, he told her he had been in "hundreds of houses in Ballard County" but he did not take things from these houses, rather he looked to see what they had. Following this unsolicited reference to Morgan's statements to her, Morgan's counsel made a motion for a mistrial based on the alleged erroneous introduction of KRE 404(b) evidence. At that time the trial court overruled the motion based on its opinion that the prejudicial impact of the statement did not rise to a level necessary to warrant a mistrial. However, the court offered to give an admonition to the jury if desired. Defense counsel, rather, rejected the offered admonition on the belief it would compound the impact of the testimony.

Later in the direct examination, D.C. **started** to refer to the "hundreds of houses" statement again, but was **cut-off** by the Commonwealth before the statement could be completed. Defense counsel again waited, until the end of D.C.'s direct examination, to object and move for mistrial. The trial court, again, overruled the motion.

Later, during cross examination, Morgan's counsel initiated a line of questioning to D.C. regarding whether she was aware Morgan had been in her house, taken anything or moved anything. She then replied she had not known Morgan had been in her home, and explained that Morgan told her, **during the course of her ordeal,** he did not take anything from the houses he had been in; he only looked around to see what they had. D.C.'s response in this regard was somewhat more relevant to the question posed by defense counsel than that of the Commonwealth.

From all of this, Morgan now complains the jury heard evidence of "prior bad acts" even though the Commonwealth had agreed not to introduce any KRE 404(b) evidence. He claims that D.C.'s multiple references to his being in "hundreds of houses in Ballard County" not only violated the pretrial KRE 404(b) agreement, but "unduly prejudiced" his case before the jury enough to warrant a mistrial.

First, it is a well-settled presumption that a jury will follow a curative admonition when a potentially prejudicial statement has been made.[28] Therefore, a timely and appropriate admonition provided by the trial court to the jury following such a statement is generally sufficient to cure an error.[29] Obviously, the trial court did not believe declaring a mistrial was the appropriate cure for D.C.'s statements but, rather, believed that an admonition was sufficient. Yet the offer of the court of an admonition was refused.

A mistrial is warranted only where the record reveals "a manifest ne-

---

27. "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), *citing Fahy v. State of Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171.

28. *Mills v. Commonwealth,* 996 S.W.2d 473, 485 (Ky.1999).

29. *Charles v. Commonwealth,* 634 S.W.2d 407 (Ky.1982).

cessity for such an action or an urgent or real necessity."[30] The trial court has discretion in deciding whether to declare a mistrial, and its decision should not be disturbed absent an abuse of discretion.[31] The trial court was the tier of fact of the impact of the statement and, upon evaluating the evidence before it, determined that the situation did not create an urgent or real necessity to declare a mistrial.

A mistrial was not, in fact, warranted in this instance, but an admonition would have been appropriate.[32] Morgan's counsel, however, waived his right to the admonition. There was no abuse of discretion by the trial court in overruling the motion for mistrial.[33]

▮ In addressing Morgan's KRE 404(b) argument, we refer to Kentucky's kidnapping statute. KRS 509.010 defines the restraint element of kidnapping as being one that can be accomplished by "physical force, **intimidation**, or deception, or by any means ..." Moreover, KRS 509.040(1)(c) establishes an intent "[t]o terrorize the victim or another, ..." as an alternative element of kidnapping. Thus, Morgan's statement to D.C. is distinguishable from KRE 404(b) evidence of other crimes, wrongs, or acts, in that the statement was intended as one of his several tools of domination (or mental restraint). Why else would he have made the statement except to intentionally intimidate (or terrorize) D.C. while she was under his control and as a means of maintaining that

control? It was as much a weapon used by Morgan to further restrict and confine her mentally and emotionally, as were the shotgun and the knife. Morgan wanted D.C. to know that he could do whatever he wanted and she was helpless. In fact, she was compelled to do as he wanted—as embarrassing and frightful as it was.

This is no different than Johnny Gilbert's use of alcohol, marijuana and pornographic movies to control, force or induce his stepdaughters into adult sexual activity; wherein we stated, "[i]t was necessary that the jury see the entire picture ..., evidence that provides necessary perspective is competent. Juries do not have to perform their function of fact-finding in a vacuum."[34] D.C. could not have given a truthful account of the ordeal without testifying as to Morgan's use of fear and intimidation, as well as the shotgun and knife, as the weapons to effectuate her kidnapping and control.

KRE 403 provides "[A]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, ...." In adjudging whether or not the probative value of evidence is substantially outweighed by the undue prejudice, this Court has consistently indicated a willingness to protect "probative evidence."

In *Springer v. Commonwealth*,[35] we upheld the admission of evidence that the defendant was romantically involved with

**30.** *Gould v. Charlton Co. Inc.*, 929 S.W.2d 734, citing *Skaggs v. Commonwealth*, 694 S.W.2d 672 (Ky.1985)

**31.** *St. Clair v. Commonwealth*, 140 S.W.3d 510, 545 (Ky.2004), *citing Jones v. Commonwealth*, 662 S.W.2d 483 (Ky.App.1983)

**32.** The jury could have been reminded it was only trying the charges in front of it at the time and that it could consider the statement made under the circumstances that then exist-

ed, but only for purposes of its potential effect on her and his control or restraint of her; not for the truth of it.

**33.** *Cf., Grundy v. Commonwealth*, Ky., 25 S.W.3d 76, 82–83 (2000).

**34.** *Gilbert v. Commonwealth*, 838 S.W.2d 376, 379 (Ky.1992).

**35.** 998 S.W.2d 439, 450 (Ky.1999).

another person on the basis of its relevancy to establish a motive for the defendant to kill her spouse; we also upheld the admission of witness testimony of "three person sexual acts" involving the same defendant and her spouse. We have also held, in *Hall v. Transit Authority*, that evidence of a sexual harassment Plaintiff's previous extramarital affair was relevant over a KRE 403 "undue prejudice objection."[36] The United States Court of Appeals for the Sixth Circuit, in *Turpin v. Kassulke*, upheld the admission of a letter written by a murder defendant as evidence of motive (which expressed envy of the wealth a friend received following the death of her husband) as well as a diary entry by the defendant which displayed the longing for wealth.[37]

In *Turpin*, the Sixth Circuit discussed the standard of review for evidence admitted or excluded under KRE 403, "A trial judge enjoys 'various substantial discretion' in 'balancing' probative value on one hand and 'unfair prejudice' on the other. Indeed, in reviewing the trial judge's balancing under KRE 403, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value."[38] Thus the probative value of D.C.'s statements outweighed any prejudicial effect on Morgan's case. There was no abuse of discretion.

With respect to the notice requirement of KRE 404(c), a prosecutor must first intend on introducing the evidence of other crimes, wrongs, or acts before notice of intent is required.[39] In this instance, it was not the intent of the Commonwealth to introduce the statement as evidence; it originated from a non-responsive answer in the Commonwealth's direct and a later response to a series of questions from the defense on cross-examination. Thus we find no error occurred in this regard.

## REFUSAL TO SUPPRESS MORGAN'S STATEMENT

■ During an interview immediately after his arrest, Morgan admitted to Deputy Gaia that he had a problem with voyeurism and had broken into D.C.'s home because he wished to see her naked. A few minutes into the interview, Morgan indicated that he no longer wished to speak with the deputy. Deputy Gaia immediately ceased the questioning. Later the same day, Morgan was approached by another deputy, Carey Batts, who again advised him of his Miranda rights. Morgan thereafter agreed to discuss the matter and gave an extensive statement to Deputy Batts.

Morgan now claims that because Deputy Batts did not specifically ask him whether he understood his rights after being Mirandized for the second time, his willingness to discuss the case cannot be considered a knowing and voluntary waiver of his rights. The trial court found otherwise, and we uphold that finding.

■ A trial court's ruling on a motion to suppress evidence is deemed conclusive if supported by substantial evidence.[40] The record of the suppression hearing indicates there was absolutely no evidence indicating that Morgan did not understand his rights or that he did not knowingly and

**36.** 883 S.W.2d 884, 887 (Ky.App.1994).

**37.** 26 F.3d 1392, 1399 (6th Cir.1994).

**38.** *Id.* at 1400.

**39.** *Cf., Hodge v. Commonwealth*, 17 S.W.3d 824, 853 (Ky.2000).

**40.** RCr 9.78; *Talbott v. Commonwealth*, 968 S.W.2d 76 (Ky.1998).

voluntarily agree to the interview with Deputy Batts. No error occurred.

## SECOND DEGREE STALKING

■ Morgan takes issue with the trial court's refusal to instruct the jury on the definition of "course of conduct" as it pertained to the second-degree stalking charge. The record indicates that while defense counsel orally requested such instruction, he did not tender a written definition. Nonetheless, the trial court ruled that it would not give a written definition, but that defense counsel was free to argue it to the jury. Accordingly, during closing argument, defense counsel explained that second-degree stalking requires proof of an intentional course of conduct, which is defined as "a pattern of conduct composed of two (2) or more acts, evidencing a continuity of purpose."[41] However, in the Commonwealth's closing argument that followed, the prosecutor made the following statements:

> You get to decide what he did that day, that's what these instructions talk about. Let's look at this. The third one is definitions and I'm going to come back, you'll only need these words if they are used in an instruction and you don't understand them. Mr. Preston told you some things that are not in here. He said some things. I didn't object. It's his closing argument. He told you some of what he said was the law. The judge tells you what the law is . . . . [Y]ou said you would follow the law the judge gave you in the form of instructions. If it's not written in here, it's not the law.

As noted in 1 Cooper, *Kentucky Instructions to Juries (Criminal)* § 3.10, p. 91 (4th ed.1999), the definition of "course of conduct" must accompany the definition of

"stalk." Without it, the jury has no way of knowing that the pattern of conduct necessary to prove stalking must include at least two intentional acts. Here, the jury was provided the written definition of "stalk," but not the definition of "course of conduct." And while the trial court ruled that defense counsel could argue the definition to the jury, the prosecutor's comments eviscerated any explanation that was given. Morgan was entitled to an instruction as to all of the elements of the offense of stalking. The definition of "course of conduct" must accompany the definition of stalk. We must conclude that the failure to properly instruct the jury on all of the elements of stalking was reversible error.

## DIRECTED VERDICT

■ Morgan further asserts, with respect to the second-degree stalking charge, that he was entitled to a directed verdict because the Commonwealth failed to prove the elements of the offense as set forth in KRS 508.150, which provides:

(1) A person is guilty of stalking in the second degree when he intentionally:

 (a) Stalks another person; and

 (b) Makes an explicit or implicit threat with the intent to place that person in reasonable fear of:

 1. Sexual contact as defined in KRS 510.010;

 2. Physical injury; or

 3. Death.

"Stalking" is defined in KRS 508.130(1) as follows:

 (a) To "stalk" means to engage in an intentional course of conduct:

 1. Directed at a specific person or persons;

---

**41.** KRS 508.130(2).

2. Which seriously alarms, annoys, intimidates, or harasses the person or person; and

3. Which serves no legitimate purpose.

(b) The course of conduct shall be that which would cause a reasonable person to suffer substantial mental distress.

Finally, as previously noted, " 'course of conduct' means a pattern of conduct composed of two (2) or more acts, evidencing a continuity of purpose." [42] Thus, to be guilty of second-degree stalking, Morgan had to engage in an intentional course of conduct, comprised of two or more acts directed at D.C. which seriously alarmed, annoyed, intimidated or harassed her, and which served no legitimate purpose.

The Commonwealth argues that the course of conduct was established by (1) Morgan's alleged entry into D.C.'s trailer sometime during the summer of 2002, and (2) the October 3, 2002 incident. Without question, the events which took place on the evening of October 3 were directed at D.C., and would have seriously alarmed, annoyed, intimidated, or harassed any reasonable person. However, while Morgan's prior alleged entry into D.C.'s trailer was directed at her, she had absolutely no knowledge of it until the evening of October 3, 2002.

In Kentucky Criminal Law, § 9–7(b), p. 402 (1998), Professors Lawson and Fortune note that with respect to the crime of stalking, the requirement that the victim be alarmed, annoyed, intimidated, or harassed, "requires that the conduct of a defendant actually cause serious mental distress to the victim." Here, it cannot reasonably be argued that D.C. suffered serious mental distress as a result of Morgan's first entry into her trailer because she was never aware that it had occurred. Moreover, D.C. herself testified that although she knew who Morgan was, she had only seen him a couple of times over the years and had no personal contact with him at all. D.C. never claimed that Morgan engaged in any acts which caused her serious mental distress prior to the night of October 3.

We conclude that the Commonwealth did not introduce sufficient evidence that Morgan engaged in a pattern of conduct composed of two or more acts, evidencing a continuity of purpose. Accordingly, as the Commonwealth failed to prove that Morgan intentionally "stalked" D.C., as that term is defined in KRS 508.130, he was entitled to a directed verdict on this charge

## VOYEURISM INSTRUCTION

 Morgan argues that he was entitled to a voyeurism instruction as a lesser-included offense of first-degree burglary. He contends that the jury could have reasonably believed that he entered D.C.'s trailer with only the intent to see her naked, not to commit another crime. The trial court denied the instruction on the grounds that voyeurism is not a lesser-included offense of first-degree burglary. We agree.

 A lesser-included offense "is established by proof of the same or less than all the facts required to establish the commission of the offense charged." KRS 505.020(2)(a). In other words, "if the lesser offense requires proof of a fact not required to prove the greater offense, then the lesser offense is not included in the greater offense, but is simply a separate, uncharged offense." [43]

42. KRS 508.130(2).

43. *Colwell v. Commonwealth*, 37 S.W.3d 721, 726 (Ky.2000); *see also Commonwealth v. Day*, 983 S.W.2d 505 (Ky.1999).

First-degree burglary is committed when a person, with the intent to commit a crime, knowingly enters or remains unlawfully in a building and, when effecting entry or while in the building or in the immediate flight therefrom, he or another participant in the crime: (a) is armed with explosives or a deadly weapon; or (b) causes physical injury to any person who is not a participant in the crime; or (c) uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime.[44] In comparison, KRS 531.090(1) provides, in pertinent part, that a person is guilty of voyeurism when:

(a) He or she intentionally:

. . . .

(3) Enters or remains unlawfully in or upon the premises of another for the purpose of observing or viewing the sexual conduct, genitals, or nipple of the female breast of another person without the person's consent; and

(b) The other person is in a place where a reasonable person would believe that his or her sexual conduct, genitals, or nipple of the female breast will not be observed, viewed, photographed, filmed, or videotaped without his or her knowledge.

Voyeurism requires proof that the defendant entered or remained unlawfully for the purpose of viewing another individual's body or sexual conduct. Proof of that fact is not required to convict a person of burglary and, as such, voyeurism is not a lesser-included offense. Under Morgan's theory, *i.e.*, that he entered D.C.'s trailer only to look at her and not to commit a crime (although he fails to recognize that voyeurism is a crime), he was entitled to an instruction on criminal trespass, which he was, in fact, given.

Moreover, the jury found beyond a reasonable doubt that Morgan unlawfully entered D.C.'s trailer "with the intention of committing a crime therein" and "was armed with a deadly weapon." Under the facts presented, the jury could not possibly have believed that Morgan entered without the intent to commit a crime and thus, even had he been entitled to a voyeurism instruction, any failure to give such would have been harmless.[45]

## VOLUNTARY INTOXICATION

██ Morgan's next claim is that the trial court erred in refusing to instruct the jury on the defense of voluntary intoxication. While Morgan did tender a requested instruction, he presented no evidence to support such.

██ Voluntary intoxication is a defense to a criminal charge if it "[n]egatives the existence of an element of the offense[.]"[46] The defense is justified only where there is evidence reasonably sufficient to prove that the defendant was so intoxicated that he did not know what he was doing.[47] Evidence of mere drunkenness is not sufficient to warrant an instruction.[48] Although Morgan claimed he had consumed as many as eleven Jack Daniels and cokes on the night in question, he also

44. KRS 511.020(1).

45. RCr 9.24.

46. KRS 501.080(1).

47. *Rogers v. Commonwealth,* 86 S.W.3d 29 (Ky.2002); *see also Springer v. Commonwealth,* 998 S.W.2d 439 (Ky.1999).

48. *Jewell v. Commonwealth,* 549 S.W.2d 807 (Ky.1977), *overruled on other grounds* in *Payne v. Commonwealth,* 623 S.W.2d 867 (Ky.1981), *cert. denied,* 456 U.S. 909, 102 S.Ct. 1758, 72 L.Ed.2d 167 (1982).

stated that he was "cool as a cucumber" during the incident. There was no evidence presented that Morgan was so intoxicated that he did not know what he was doing when he entered D.C.'s trailer. Accordingly, he was not entitled to a voluntary intoxication instruction.

## IMPROPER CLOSING ARGUMENT

■ Finally, Morgan claims the Commonwealth made several prejudicial statements to the jury during the penalty phase closing arguments. Counsel for Morgan objected to, and thus preserved for review, the Commonwealth's reference to his courtroom behavior subsequent to the guilt phase, specifically that he pulled off his tie and popped the top on a Sprite. The claim of error for the Commonwealth's statement that the jury should give the defendant a "strong, clear message" was not preserved for review at trial, therefore any review must be for palpable error.

RCr 10.26 states:

A palpable error which affects the substantial rights of a party may be considered by the court on motion for new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

■ It is well settled and recognized that broad latitude must be allowed counsel in presenting a case to the jury.[49] It has long been this Court's opinion that the closing arguments should always be considered "as a whole" and that wide latitude be allowed parties during closing arguments.[50] Opening and closing arguments are not evidence and counsel is allowed great latitude in both.[51]

The statements made did not rise to the level of prosecutorial misconduct. As we have held in *Stopher v. Commonwealth*,[52] "In order to justify reversal, the misconduct of the prosecutor must be so serious as to render the entire trial fundamentally unfair." Here, the Commonwealth asked the jury to "give him a clear, strong message. One, that this won't be tolerated in Ballard County. That we are going to be safe. [D.C.] can be safe, as long as he is locked away. And, two, that it's because of his actions . . . ." In evaluating the overall fairness of this trial, we cannot conclude that the conduct of the Commonwealth was so serious as to render the entire trial fundamentally unfair. The statements made by the Commonwealth in its closing argument were within the wide latitude allowed them, and the closing argument was neither unfair nor improper.

However, even if, for the sake of argument, we were to find error in the Commonwealth's statements, the error would be harmless as it did not, in any way, contribute to his conviction.[53] On the evidence, Morgan's conviction was both just and right and does not warrant reversal on this issue. We find no error in the statements made by the Commonwealth.

**49.** *Dean v. Commonwealth*, 844 S.W.2d 417, 421 (Ky.1992), *citing Stasel v. Commonwealth*, 278 S.W.2d 727, 729 (Ky.1955).

**50.** *Young v. Commonwealth*, 25 S.W.3d 66 (Ky.2000).

**51.** *Slaughter v. Commonwealth*, 744 S.W.2d 407 (Ky.1987), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3174, 104 L.Ed.2d 1036 (1989); *Stopher v. Commonwealth*, 57 S.W.3d 787, 805 (Ky.2001), *cert. denied*, 535 U.S. 1059, 122 S.Ct. 1921, 152 L.Ed.2d 829 (2002).

**52.** 57 S.W.3d 787, 805 (Ky.2001), citing *Summitt v. Bordenkircher*, 608 F.2d 247 (6th Cir. 1979), *Chumbler v. Commonwealth*, 905 S.W.2d 488 (Ky.1995).

**53.** *Chapman*, 386 U.S. at 23, 87 S.Ct. 824.

## CONCLUSION

We therefore affirm the convictions for first-degree burglary charge, two (2) counts of kidnapping, terroristic threatening, first-degree sexual abuse, and first-degree criminal trespass.[54] We hereby reverse and dismiss the second-degree stalking conviction. Further, we remand to the trial court for entry of an amended judgment of conviction and sentencing order consistent herewith.

GRAVES and WINTERSHEIMER, JJ., concur.

ROACH, J., concurs in result only and concurs by separate opinion in which GRAVES, J., joins.

GRAVES, J., also concurs by separate opinion.

COOPER, J., dissents by separate opinion in which LAMBERT, C.J.; and JOHNSTONE, J., join.

JOHNSTONE, J., dissents by separate opinion in which LAMBERT, C.J., and COOPER, J., join.

Concurring opinion by Justice GRAVES.

I concur in the majority opinion, but I write separately to question the efficacy of the modern peremptory challenge system.

There is no even-handed method in place for trial courts to evaluate the neutrality of a peremptory challenge, thereby creating inconsistent application and potential for seating a biased juror. For instance, in this Commonwealth, a trial judge sitting in McCracken County may find a peremptory challenge neutral, while a judge in Fayette County may find the same challenge a pretext for discrimination. Notwithstanding the subjectivity of

such an inquiry, accepting an attorney's pretextual reasoning at face value may be the most attractive alternative if a trial judge does not wish to accuse a colleague of discriminatory motives. Raymond J. Broderick, *Why the Peremptory Challenge Should Be Abolished,* 65 TEMP. L. REV. 369, 422 (1992).

The opinion of the majority knocks peremptory challenges from their prior "substantial right" perch. Consequently, applying harmless error review to a curative peremptory challenge does not unfairly deprive a litigant of a challenge; rather it furthers the state's valid interest in seating an impartial jury. William G. Childs, *The Intersection of Peremptory Challenges, Challenges for Cause, and Harmless Error,* 27 AM. J. CRIM. L. 49, 65 (1999) (discussing the policy concerns of *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988)).

*Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) intended to prohibit race discrimination in the jury selection process. In a concurring opinion, Justice Marshall recognized, "[Batson] will not end the racial discrimination that peremptories inject into the jury-selection process. That goal can be accomplished only by eliminating peremptory challenges entirely." *Id.* at 102–03, 106 S.Ct. 1712 (Marshall, J., concurring).

Justice Breyer also recently quoted this passage in his concurring opinion in *Miller–El v. Dretke,* 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Justice Breyer notes "the difficulty of finding a legal test that will objectively measure the inherently subjective reasons that underlie use of a peremptory challenge[,]" *Id.* at 2340, and proposes that "it is necessary to

---

**54.** The first-degree criminal trespass conviction stemmed from Morgan's prior entry into

D.C.' home in June of 2002.

reconsider *Batson's* test and the peremptory challenge system as a whole." *Id.* at 2344 (Breyer, J., concurring).

While I support the changes that will occur as a result of this opinion, I hope it may be one step closer to the inevitable implosion of the current peremptory challenge system. In closing, I am reminded, "the right to a jury free of discriminatory taint is constitutionally protected—the right to use peremptory challenges is not." *Id.* (Breyer, J., concurring).

Concurring opinion by Justice ROACH.

I agree with the result reached in the Opinion of the Court, but I write separately because I believe that the discussion of *Thomas v. Commonwealth*, 864 S.W.2d 252 (Ky.1993), and the historic treatment of this issue deserve further attention. *Thomas* overruled *Turpin v. Commonwealth*, 780 S.W.2d 619 (Ky.1989), and *Dunbar v. Commonwealth*, 809 S.W.2d 852 (Ky.1991), and proclaimed that *Turpin* and *Dunbar* were "premised on a misunderstanding of the United States Supreme Court decision in *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988)." *Thomas*, 864 S.W.2d at 259. This conclusion was simply incorrect.

In the context of the right to an impartial jury as guaranteed by the Sixth Amendment, the United States Supreme Court noted in *Ross* that it had *"long recognized that peremptory challenges are not of constitutional dimension." Ross*, 487 U.S. at 88, 108 S.Ct. at 2278 (emphasis added). More recently, the Court has reiterated and amplified this point:

> The peremptory challenge is part of our common-law heritage. Its use in felony trials was already venerable in Blackstone's time. See 4 W. Blackstone, Commentaries 346–348 (1769). We have long recognized the role of the peremptory challenge in reinforcing a defen-

dant's right to trial by an impartial jury. See, *e.g., Swain v. Alabama*, 380 U.S. 202, 212–213, 218–219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *Pointer v. United States*, 151 U.S. 396, 408, 14 S.Ct. 410, 38 L.Ed. 208 (1894). But we have long recognized, as well, that such challenges are auxiliary; unlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension. *Ross*, 487 U.S., at 88, 108 S.Ct. 2273, 101 L.Ed.2d 80; see *Stilson v. United States*, 250 U.S. 583, 586, 40 S.Ct. 28, 63 L.Ed. 1154 (1919) ("There is nothing in the Constitution of the United States which requires the Congress to grant peremptory challenges.").

*United States v. Martinez–Salazar*, 528 U.S. 304, 311, 120 S.Ct. 774, 779, 145 L.Ed.2d 792 (2000). Rather than rising to the level of a Constitutional right, peremptory challenges are merely a means to secure another right, namely that of an impartial jury. *Ross*, 487 U.S. at 88, 108 S.Ct. at 2278 ("They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that a defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated."). It is clear that the defendant in *Thomas*, much like the defendant in this case, was not deprived of the right to an impartial jury.

This Court side-stepped this issue in *Thomas* by explaining that the relevant issue was a " 'due process' question" rather than an " 'impartial jury' question" and concluded by noting that *Ross v. Oklahoma* recognized this due process question and "*Turpin* and *Dunbar*, misapplying *Ross v. Oklahoma*, do not." *Thomas*, 864 S.W.2d at 260. Because peremptory challenges are not a right granted by the United States Constitution, however, the

due process question turns only on whether the defendant received what he was entitled to under state law. *Ross,* 487 U.S. at 90–91, 108 S.Ct. at 2279–80.

Therefore, the sole question before this Court on this issue is whether Kentucky law mandates the result dictated in *Thomas* by elevating peremptory challenges to the level of a substantial right. I agree with Justice Keller when he noted that he could "find no support for it in the Kentucky Constitution." *Stopher v. Commonwealth,* 57 S.W.3d 787, 816 (Ky.2001) (Keller, J., dissenting). The dissent claims that "we and our predecessor court have always deemed the right to peremptory challenges to be a substantial right, *i.e.,* one to which a party is clearly entitled and the erroneous denial of which cannot be deemed harmless for purposes of our harmless error and palpable error rules." Post at 123. The dissent itself demonstrates that this characterization is inaccurate. First, as noted above, from the *Turpin* decision in 1989 until *Thomas* was decided, Kentucky did not employ the "per se reversible" rule. Second, the dissent admits that from 1870 until 1935 this Court did not review challenges to the panel for cause. Therefore, the issue before us today would have never been before our predecessor court during that time frame.

Moreover, many of the cases relied upon by the dissent concern the denial of the actual number of peremptory challenges to which a defendant is entitled to under the applicable rules. *See, e.g., Pendly v. Illinois Central R.R. Co.,* 28 Ky.L.Rptr. 1324, 92 S.W. 1, 2 (1906); *Pryor v. Commonwealth,* 32 Ky. (2 Dana) 298 (1834). But there is a distinction between the denial of

the right to use one's peremptory challenges under the rules and the so-called "impairment" of this right by the erroneous failure to strike a juror for cause. Denial of a right to the number of peremptory challenges, say six instead of the eight granted by RCr 9.40(1) in a felony prosecution, is literally a denial of what is allowed by Kentucky law. Such a defendant is precluded from exercising his full complement of peremptory challenges. On the other hand, the "impairment" of the right, if such can really be said to exist, is not a denial or misallocation of peremptory challenges. Consider, for example, a felony criminal defendant who uses two peremptory challenges to strike jurors who should have been struck for cause and uses the other six in an arbitrary manner. Such a defendant has exercised eight peremptory challenges, which is all he is allowed under RCr 9.40(1).[1]

Many of the authorities relied upon by the dissent recognize this distinction, and the distinction is well-grounded in our own law. After all, Section 334 of the Criminal Code of Practice mandated that a conviction of a felony could only be reversed for four grounds, one of which was an "error in allowing or disallowing a peremptory challenge." This error did not include the erroneous failure to strike a juror for cause. *See, e.g., Moore v. Commonwealth,* 70 Ky. (7 Bush) 191 (1870). As our predecessor court explained:

> It is conceded by counsel for defendant in their brief, and in oral argument of the case before this court, that under section 281 of the Criminal Code we have held, in cases innumerable, that it denied to a defendant in a criminal prosecution the right to appeal from the

---

1. This, of course, assumes that the defendant's situation calls only for eight peremptory challenges. Where the rules allow for more, *e.g.,* when alternate jurors are called, RCr 9.40(2), the trial court's refusal to grant the extra peremptory challenges would fall under the former category of denied peremptory challenges.

decisions of the trial court "upon challenges to the panel, and for cause." We suppose that it would be no exaggeration to say that, since the adoption of the Criminal Code, with that section in it, we have upheld and applied it in at least 100 cases, and consequently have declined to review the decisions and rulings of the trial court in criminal prosecutions upon questions touching the impaneling of the jury and challenges to prospective jurymen. We so held, in the great number of cases coming before us, upon the all-sufficient ground that by the express terms of that section the defendant was denied the right to appeal from the decision of the trial court upon those matters.

*Lake v. Commonwealth*, 209 Ky. 832, 273 S.W. 511, 512 (1925).

Therefore, I agree with the dissent that "our courts have consistently held that a denial or misallocation of peremptory challenges, when properly preserved, is *per se* reversible error." Post at 137. *See also* cases cited by dissent on pages 136–37. However, this specific issue is not before the Court. There is no allegation that there was a misallocation of peremptory strikes, e.g., where one party receives more than the other, or a denial of peremptory strikes, e.g., where a party is given less peremptory strikes than allowed by the statute.

More importantly, however, I think that the dissent's claim that Kentucky law has always applied a per se reversal rule is simply incorrect. As discussed above, there were at least two periods, one quite recent, where we did not apply the *per se* rule. And despite the dissent's claim to the contrary, it is far from clear that we applied the *per se* reversal rule in the years leading up to the *Turpin* decision. While it is true that many of the cases, beginning with *Tate v. Commonwealth*,

258 Ky. 685, 80 S.W.2d 817 (1935), contain language that refers to a defendant's failure to exercise all of his peremptory challenges, none of those early cases articulate a *per se* reversal rule. In *Tate*, the Court was addressing whether the defendant was entitled to a change of venue. The Court concluded that the defendant had failed to provide grounds for reversal, noting in part: "Moreover, it nowhere appears that any one on the jury list who had read the newspaper accounts of the homicide was eventually accepted on the jury, or that defendant was compelled to accept any such one because of having exhausted his peremptory challenge." *Id.* at 820. This is not even a complete articulation of the rule urged by the dissent. And it would appear that *Tate* requires that an objectionable juror sat on the jury. Moreover, this single line of dicta, which serves as the foundation of the "rule" advanced by the dissent, appears without any supporting reasoning or citation. It was, at best, a truism thrown in as an alternative ground for affirming the conviction.

The other cases relied upon by the dissent contain little more than a restatement of this truism. *See, e.g., Messer v. Commonwealth*, 297 Ky. 772, 775, 181 S.W.2d 438, 440 (Ky.1944); *Jones v. Commonwealth*, 281 S.W.2d 920, 925 (Ky.1955); *Lefevers v. Commonwealth*, 558 S.W.2d 585, 588 (Ky.1977); *Smith v. Commonwealth*, 734 S.W.2d 437, 444 (Ky.1987); *Derossett v. Commonwealth*, 867 S.W.2d 195, 197 (Ky.1993). In fact, some of these cases contain rather ambiguous language. For example, in *Lefevers*, after noting that the defendant had five remaining peremptory strikes, the court stated:

In *Rigsby v. Commonwealth*, Ky., 495 S.W.2d 795 (1973), we said:

"Appellants complain of an abuse of discretion by the trial court in refusing certain challenges for cause.

The argument is unavailing because nowhere do appellants assert they were forced to exhaust their peremptory challenges, nor does examination of the record reveal such circumstance. *All the jurors in question were removed by way of peremptory challenges. A defendant who fails to exhaust such challenges cannot complain concerning the jury selection. Certainly if the biased juror is not impanelled, no prejudice can result.* There has been no showing that use of the eleven peremptories to dispose of the suspect jurors resulted in a subsequent inability to challenge additional unacceptable veniremen. Therefore, favorable consideration may not be given to appellants' assertions."

*It appears that not only were the jurors who expressed bias not impaneled, but appellant had five remaining unused challenges. No prejudice resulted to the appellant.*

*Lefevers,* 558 S.W.2d at 588 (emphasis added). Other cases relied upon by the dissent present situations where the juror who should have been struck for cause actually served on the jury after the defendant exhausted their peremptory strikes. *See, e.g., Tayloe v. Commonwealth,* 335 S.W.2d 556, 557 (Ky.1960); *Brumfield v. Commonwealth,* 374 S.W.2d 499, 500 (Ky. 1964); *Marsch v. Commonwealth,* 743 S.W.2d 830, 831 (Ky.1987).

These cases fall far short of presenting a consistent rule. Before the *Thomas* decision, the *per se* reversal rule urged by the dissent was, at most, hinted at—full realization and application of the rule from those cases requires a good bit of inference. In fact, I have been unable to find any Kentucky case, except for *Dunbar, Turpin,* and *Thomas,* that contains a substantive analysis of the specific issue be-

fore this Court. And those cases, coming soon after the *Ross* decision, focused on claims about federal constitutional rights. But again, the real inquiry is what is provided by Kentucky law—the earlier emphasis on the effect of *Ross* and whether peremptory challenges implicated due process were red herrings. Since our cases from 1933 until *Thomas* failed to present a consistent or compelling rule, I believe it is appropriate for us to revisit the issue.

The dissent discusses several alleged errors that simply are not claimed in this case and attempts to impute holdings and theories that I for one do not believe are necessarily part of our holding. For example, the dissent claims that the majority opinion would deem an uneven allotment of peremptory challenges, that is, in direct contravention of the rule, as harmless error. No part of the majority opinion makes this holding. And, as I discuss above, there is a clear difference between such a claim of error and the one actually presented in this case.

The dissent also attempts to claim that the current trend in American law is toward the *per se* reversal rule. But the clear weight of authority across the United States rejects this view. By my count, twenty-six states have unequivocally rejected the *per se* reversal rule. *See Dailey v. State,* 828 So.2d 340, 343–44 (Ala.2001); *Minch v. State,* 934 P.2d 764, 769–70 (Alaska Ct.App.1997); *State v. Hickman,* 205 Ariz. 192, 68 P.3d 418, 427 (2003); *Bangs v. State,* 338 Ark. 515, 998 S.W.2d 738, 744–45 (1999); *State v. Pelletier,* 209 Conn. 564, 552 A.2d 805, 810 (1989); *Manley v. State,* 709 A.2d 643, 655–56 n. 15 (Del. 1998); *State v. Ramos,* 119 Idaho 568, 808 P.2d 1313, 1315 (1991); *Dye v. State,* 717 N.E.2d 5, 18 n. 13 (Ind.1999); *State v. Neuendorf,* 509 N.W.2d 743, 747 (Iowa 1993); *State v. Manning,* 270 Kan. 674, 19 P.3d 84, 97–98 (2001); *People v. Bell,* 473

Mich. 275, 702 N.W.2d 128, 138 (2005); *State v. Anderson,* 603 N.W.2d 354, 356 (Minn.Ct.App.1999) (citing *State v. Stufflebean,* 329 N.W.2d 314, 317 (Minn.1983)); *Johnson v. State,* 754 So.2d 576, 578 (Miss. Ct.App.2000); *State v. Storey,* 40 S.W.3d 898, 904–05 (Mo.2001); *State v. Quintana,* 261 Neb. 38, 621 N.W.2d 121, 134 (2001); *Blake v. State,* 121 P.3d 567, 578 (Nev. 2005); *State v. DiFrisco,* 137 N.J. 434, 645 A.2d 734, 751–53 (1994); *State v. Entzi,* 615 N.W.2d 145, 149 (N.D.2000); *State v. Barone,* 328 Or. 68, 969 P.2d 1013, 1018–19 (1998); *Green v. Maynard,* 349 S.C. 535, 564 S.E.2d 83, 86 (2002); *State v. Verhoef,* 627 N.W.2d 437, 441–42 (S.D.2001); *State v. Thompson,* 768 S.W.2d 239, 246 (Tenn. 1989); *State v. Menzies,* 889 P.2d 393, 399–400 (Utah 1994); *State v. Fire,* 145 Wash.2d 152, 34 P.3d 1218, 1225 (2001); *State v. Lindell,* 245 Wis.2d 689, 629 N.W.2d 223, 246 (2001); *Klahn v. State,* 96 P.3d 472, 483–84 (Wyo.2004). In addition, some of the states listed above have overturned long-standing precedent after *Ross* and *Martinez–Salazar. See, e.g., State v. Neuendorf* 509 N.W.2d 743, 746–47 (Iowa 1993)(abandoning forty years of precedent); *State v. Fire,* 145 Wash.2d 152, 34 P.3d 1218, 1222–23 (2001)(overruling a case decided in 1902).

In fact, the view articulated by the dissent is an extreme minority position. At least one of the states that the dissent characterizes as retaining the *per se* reversal rule actually describes the rule as one of "harmful error" and imposes stringent procedural requirements in order to receive the benefit of the rule. *See, e.g., McBean v. State,* 167 S.W.3d 334, 338 (Tex.App.-Amarillo 2004) ("[W]hen a challenge for cause is erroneously denied and the challenging party uses a peremptory challenge to strike the disqualified veniremember, then the erroneous denial may be harmful error because the challenging party has effectively received fewer perempto-

ry challenges than provided by statute. In such a circumstance the aggrieved party has suffered harmful error if the party (1) used a peremptory challenge to strike the challenged, disqualified veniremember; (2) exhausted all remaining peremptory challenges; (3) requested and was denied an additional peremptory challenge, and (4) identified a specific veniremember who would have been removed with the additional challenge, and who thereafter sat as a juror."(citation omitted). And two of the states that the dissent cites effectively require an affirmative showing of prejudice since they require an objectionable juror to have sat on the jury before reversal will be granted. *See Busby v. State,* 894 So.2d 88, 96–97 (Fla.2004)(explaining that "expenditure of a peremptory challenge to cure the trial court's improper denial of a cause challenge constitutes reversible error if a defendant exhausts all remaining peremptory challenges and can show that an objectionable juror has served on the jury."); *Hanson v. State,* 72 P.3d 40, 49 (Okla.Crim.App.2003) ("In order to show he was prejudiced by this error, Hanson must show that his peremptory challenges were reduced so he was forced, over objection, to keep an unacceptable juror.")).

In addition, the dissent's reliance on *State v. McLean,* 815 A.2d 799 (Me.2002) and *Whitney v. State,* 158 Md.App. 519, 857 A.2d 625 (2004) is misguided. Both of these cases concern the denial of the proper number of peremptory strikes and do not address the issue before this Court. These are claims of denial or misallocation of peremptory challenges. And again, such cases present a different issue than the one currently before the Court.

In the final analysis, it appears that only six states—Colorado, Georgia, Louisiana, Montana, New York and Virginia—follow the dissent's postion. This hardly constitutes a nationwide trend.

Interestingly, although the dissent appears to have relied heavily on Professor Pizzi and Judge Hoffman for its historical overview, see William T. Pizzi & Morris B. Hoffman, *Jury Selection Errors on Appeal*, 38 Am.Crim. L.Rev. 1391, 1406–18 (2001) (similarly recounting the history of peremptory challenges), it fails to discuss their conclusions concerning harmless error. They offer six hypothetical scenarios involving peremptory challenges. One of their hypotheticals, "scenario 3", is the identical situation before us in this matter: "The trial court erroneously denies a defense challenge for cause, the defendant exhausts all his or her peremptory challenges, and the defendant uses one of the peremptory challenges on the erroneously retained juror." *Id.* at 1429. Professor Prizi and Judge Hoffman then note that there simply is no error in such a situation:

> Notwithstanding that Scenario 1, 2, 3 and 5 errors are in fact "errors," we nevertheless contend that the general rule in each of these four scenarios should be that the jury selection error is harmless and that the convictions must be affirmed. In each of these scenarios, no demonstrably biased prospective jurors end up sitting on the jury, so none of the scenarios involves any violation of a defendant's right to an impartial jury under the Sixth Amendment. In other words, all the jurors who actually sit in a Scenario 1, 2, 3 or 5 case were properly passed for cause.

> The only effect of a Scenario 1, 2, 3 or 5 error is an imbalance in peremptory challenges. Is this really the kind of error, and really the kind of "right," that justifies reversing otherwise perfectly valid convictions returned by perfectly impartial jurors? The answer must be no. This error is not constitutional, is not structural and is harmless by any measure of that inquiry.

> Scenario 1, 2, 3, and 5 error is certainly not constitutional error. Because a criminal defendant has no right to any peremptory challenges, it is difficult to understand how an imbalance in peremptory challenges could rise to the level of constitutional error. Legislatures and supreme courts could abolish all peremptory challenges tomorrow without inflicting constitutional injury on criminal defendants. They could probably even eliminate all defense peremptory challenges and retain all prosecution peremptory challenges. A trial court's unintentional elimination of a single defense peremptory challenge likewise inflicts no constitutional injury.

*Id.* at 1431–32 (footnotes omitted).

Professor Pizzi and Judge Hoffman further explain:

> Moreover, since *Chapman* and *Fulminante*, it is also clear that Scenario 1, 2, 3 and 5 errors are not structural errors and are therefore subject to harmless error review, even if by some stretch of the imagination we might label them "constitutional" errors. An error is no longer structural just because it is constitutional error or because it involves some other especially important right, or even just because its impacts may be difficult to gauge. The inquiry is reliability. How can it be said that the reliability of a trial is likely to be compromised when a defendant loses a single peremptory challenge, but when all the jurors who actually hear the case are fair and impartial? It cannot. By any sensible measure of "structural error," and certainly by the Court's increasingly strict measures, jury selection error of this sort is not "structural."

> This brings us to the harmless error inquiry. If ever there were a category of errors that borders on "harmless as a matter of law," it is the errors in Scenar-

ios 1, 2, 3 and 5. The juries in these Scenarios were vetted for cause, and all of them were, by definition, fair and impartial. Yet they returned convictions. By any measure of harmlessness, depriving a defendant of a single peremptory challenge will surely be harmless in most if not all cases.

The uniqueness of jury selection errors is that by their very nature they offer no resistance to the evidentiary or instructional counterweights we typically place on the scales of harmlessness. Ordinarily, the harmless error inquiry requires an appellate court to ask whether the same jury would have reached the same result with different evidence or different instructions. However, under these scenarios, an impartial jury has already determined, based on all the evidence and the instructions of law, that the prosecution has proved defendant's guilt beyond a reasonable doubt. The jury selection errors in Scenarios 1, 2, 3 and 5 require appellate courts to ask whether a different but equally impartial jury would have reached the same result with the same evidence and the same instructions. The very foundations upon which our system is built—that cases are decided based on the law and the evidence, and not on the peccadilloes of the fact-finders—will almost always require us to conclude that such errors are harmless.

*Id.* at 1432–33 (footnotes omitted).

There are also other compelling policy arguments against retaining a *per se* reversal rule. After *Martinez–Salazar* was issued, the Wisconsin Supreme Court conducted an analysis of its own peremptory challenge law in *State v. Lindell*, 245 Wis.2d 689, 629 N.W.2d 223 (2001), and reversed that state's long-standing *per se* error position in light of *Ross* and *Martinez–Salazar*. The Wisconsin Supreme Court analyzed *Martinez–Salazar* at length and also considered other states' treatment of the issue. In fact, the court cited to Justice Keller's dissent in *Stopher*. After analyzing the applicable federal and state decisions at length, Wisconsin's high court stated that the *per se* error rule meant that

> whenever two members of the court of appeals or four members of the supreme court make a different call on bias than the circuit court, the automatic result is a new trial. This is the rule notwithstanding the absence of any deficiency in the first trial.

> This puts the defendant in a "win-win" situation, as Justice Crooks explained in his *Ramos* dissent. If the circuit court erroneously fails to exclude a prospective juror who should be struck for cause, the defendant may take his or her chances and refuse to exercise a peremptory challenge, wait until the jury renders its verdict, appeal if he or she does not like the result, and then receive a new trial. On the other hand, the defendant may exercise a peremptory challenge and strike the prospective juror, then claim after a trial that produces a bad result that his or her due process was violated. The latter rule applies even though the defendant's peremptory strike comes so quickly that the prosecutor has no chance to use a strike to correct the error. *This sort of gamesmanship does not instill confidence in our system of justice.*

*Id.* at 248–49 (paragraph numbering and citations omitted, emphasis added). This reasoning applies equally to Kentucky law. As Justice Keller noted, recognition of peremptory challenges as substantial rights "serves one function and one function only—it manufactures reversible error where the case has been decided by a fair

and impartial jury." *Stopher*, 57 S.W.3d at 814 (Keller, J., dissenting).

GRAVES, J., joins this concurring opinion.

Dissenting opinion by Justice COOPER.

Without benefit of intelligible briefing [1] or even oral argument, a majority of this Court has seized upon this case to alter the manner in which jury trials, both criminal and civil, will hereafter be practiced in Kentucky (at least until the membership of this Court changes once again). In doing so, the majority seems to suggest that the *per se* reversible error rule, heretofore applied when a litigant is denied the peremptory challenges to which he/she/it is lawfully entitled, was created out of whole cloth in *Thomas v. Commonwealth*, 864 S.W.2d 252 (Ky.1993) (a case unmentioned in the Commonwealth's brief). On the contrary, as will be pointed out, *infra*, denial of the peremptory strikes authorized by law has been regarded as prejudicial to a litigant's substantial rights in Kentucky for more than 170 years. *Pryor v. Commonwealth*, 32 Ky. (2 Dana) 298 (1834) (criminal case); *Clarke v. Goode*, 29 Ky. (6 J.J. Marsh.) 637, 637–38 (1831) (civil case). The majority opinion seems to equate a "substantial right" with a "constitutional right"; however, neither *Thomas* nor any other Kentucky case has ever suggested that the requirement that "[t]he ancient mode of trial by jury shall be held sacred ... and the right thereof remain

inviolate," Ky. Const. § 7, refers to jury challenges.

The common-law right of trial by jury is preserved in the Constitution, but that instrument does not attempt to regulate the manner in which jurors shall be selected or the qualifications they must possess ....

*Wendling v. Commonwealth*, 143 Ky. 587, 137 S.W. 205, 207 (1911). *See also Haight v. Commonwealth*, 41 S.W.3d 436, 444 (Ky. 2001) ("There is no constitutional right to peremptory challenges."). However, because "they are ... [a] means to the constitutional end of an impartial jury and a fair trial," *Georgia v. McCollum*, 505 U.S. 42, 57, 112 S.Ct. 2348, 2358, 120 L.Ed.2d 33 (1992), we and our predecessor court have always deemed the right to peremptory challenges to be a substantial right, *i.e.*, one to which a party is clearly entitled and the erroneous denial of which cannot be deemed harmless for purposes of our harmless error and palpable error rules. RCr 9.24 & 10.26; CR 61.01 & 61.02.

[E]very error is deemed prejudicial to the substantial rights of a party which denies him relief to which he is clearly entitled,—clear not only in view of the basis on which the right depends, but as to the mode by which the result is to be reached.

*Clark v. Mason*, 264 Ky. 683, 95 S.W.2d 292, 298 (1934); *Wathen v. Byrne*, 12 S.W. 197, 198 (Ky.1889).

1. The Commonwealth's brief cites *United States v. Martinez–Salazar*, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), only for the propositions that peremptory strikes are not of constitutional dimension, an issue settled long ago in *Stilson v. United States*, 250 U.S. 583, 586, 40 S.Ct. 28, 30, 63 L.Ed. 1154 (1919) ("There is nothing in the Constitution of the United States which requires the Congress to grant peremptory challenges to defendants in criminal cases; trial by an impar-

tial jury is all that is secured."), and that "[i]t cannot be reversible error for appellant to exercise a peremptory against a juror he wishes he could have struck for cause, *if, like any other qualified juror, there is not basis to strike the juror for cause.*" Appellee's brief, at 6 (emphasis added). Obviously, *Martinez–Salazar* has nothing to do with peremptorily challenging a qualified juror with respect to whom there is no basis for a challenge for cause.

Despite the majority opinion's apparent belief that *Thomas* is the source of all reversals for jury selection errors, I have found only one opinion of this Court, Justice Wintersheimer's majority opinion in *Fugate v. Commonwealth*, 993 S.W.2d 931, 938 (Ky.1999), that relied on *Thomas* in reversing a case under facts such as these. Two other cases, one criminal and one civil, cited *Thomas*'s characterization of the right of peremptory challenge as a "substantial right" in reversing a trial court because of the improper allocation of peremptory strikes—the "older brother" of what occurred here. *Springer v. Commonwealth*, 998 S.W.2d 439, 444–45 (Ky. 1999); *Bowling Green Mun. Utils. v. Atmos Energy Corp.*, 989 S.W.2d 577, 579–80 (Ky.1999).

Furthermore, as discussed *infra*, *United States v. Martinez–Salazar*, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), upon which the majority opinion primarily relies, not only reflects a misconception of the realities of the practice of law in "real world" courtrooms, it thankfully applies only to federal cases and is not binding precedent on state courts such as ours.

> Because peremptory challenges are a creature of statute and are not required by the Constitution, it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise. As such, the "right" to peremptory challenges is "denied or impaired" only *if the defendant does not receive that which state law provides.*

*Ross v. Oklahoma*, 487 U.S. 81, 89, 108 S.Ct. 2273, 2279, 101 L.Ed.2d 80 (1988) (emphasis added) (citations omitted). While the early tendency among state courts was to embrace *Martinez–Salazar*, the majority of the recent cases, as discussed *infra*, have trended against it (by a three-to-one margin since 2002).

Under the law of this Commonwealth at the time of Appellant's trial and at the time of this writing, the prosecution and a criminal defendant are entitled to eight peremptory challenges each. RCr 9.40(1). By refusing to excuse Juror 19 for cause, thereby forcing Appellant to excuse him by peremptory, the trial court reduced Appellant's peremptory challenges to seven while leaving the prosecution with its full complement of eight,[2] thus indirectly misallocating the peremptory challenges provided by law. Despite agreeing that Juror 19 was clearly biased and that the trial court's refusal to excuse him for cause was error, the majority opinion relies on *Martinez–Salazar* in holding that Appellant's choice to remove the juror by peremptory challenge rather than be tried by a biased juror rendered the trial court's error harmless.[3] The majority and *Martinez–Salazar* hold that, in order to preserve such an error for review, a litigant must leave the biased juror on the jury, then assert on appeal that the resulting conviction must be reversed because he (the litigant) was denied his right to a fair and impartial jury. See *Martinez–Salazar*, 528 U.S. at 315–16, 120 S.Ct. at 781–82. Of course, no responsible lawyer or litigant in his or her right mind would pursue that route except in rare circumstances.[4]

---

**2.** Both sides exercised all of their peremptory challenges, and neither side's challenges duplicated any of the other's.

**3.** *Martinez–Salazar*, however, did not ground its holding on "harmless error," but, apparently, on "unpreserved error," as discussed *infra* in the text.

**4.** The only conceivable reason for such a strategy would be when a guilty verdict is certain and the primary relief sought is the delay inherent in reversals and retrials, *e.g.*, when the death penalty is imposed.

Even if, as here, the juror's admitted bias was so obvious as to make reversal a virtual certainty, the litigant will still opt at least to attempt to prevail at the first trial so as to avoid the expense of an appeal and second trial, or, worse, intervening jail time during the inherent delay on appeal. Referring to this proposition as a "strained analysis," William T. Pizzi & Morris B. Hoffman, *Jury Selection Errors on Appeal*, 38 Am.Crim. L.Rev. 1391, 1401 (2001), and a "strange invitation," *id.* at 1405, 1434, Professor Pizzi and Judge Hoffman [5] conclude: "We cannot imagine a circumstance in which a competent defense lawyer could ethically, or would practically, decide to infect his client's jury with a demonstrably biased juror who could have been removed with an available peremptory challenge." *Id.* at 1404.[6] If, as asserted by *Martinez–Salazar*, 528 U.S. at 315, 120 S.Ct. at 781, its "strange invitation" is not a "no choice," it is certainly a Hobson's choice.[7]

A full understanding of the significance of today's decision requires some historical perspective.

## I. PEREMPTORY CHALLENGES IN ENGLISH COURTS.

The notion of a jury as the arbiter of disputes is of ancient origin, probably originating with the Athenian "dikasteria." *See generally* Lloyd E. Moore, *The Jury: Tool of Kings, Palladium of Liberty* 2, 4–8 (2d ed. Anderson 1988). The concept of peremptory challenges is generally traced to Roman senatorial trials that originated in the pre-Christian era. Each year, the Senate chose eighty-one of its members to serve as prospective jurors. Each litigant could challenge fifteen, leaving a jury of fifty-one. *Id.* at 3.

The concept of trial by jury probably did not exist in England prior to the Norman Conquest of 1066 and is generally thought to have its Norman/English origins in Charlemagne's "inquisitio." *Id.* at 13–19 (citing Heinrich Brunner, *The Origin of Juries* (Berlin 1872)). Prior to the Conquest, the three basic trial methods in England were trial by compurgation,[8] trial by combat,[9] and, most often in felony cases, trial by ordeal.[10]

---

**5.** Judge Hoffman is a "hands on" judge presiding over the District Court for the Second Judicial District of Colorado (Denver).

**6.** On the other hand, Judge Posner posits that this puts an aggrieved civil "litigant in a heads-I-win-tails-you-lose position: if he wins a jury verdict, he can pocket his victory, and if he loses, he can get a new trial." *Thompson v. Altheimer & Gray*, 248 F.3d 621, 623 (7th Cir.2001). That is why, as a young lawyer, I was schooled to rejoice if the trial court erred in favor of my opponent and to commence negotiations if the court erred in favor of my client.

**7.** A Hobson's choice, named for Thomas Hobson, an English liveryman who required his customers to take the horse nearest the stable door or none, is defined as "[t]he necessity of accepting something objectionable through the fact that one would otherwise get nothing at all." *Webster's Third New International*

*Dictionary of the English Language Unabridged* 1076 (1993).

**8.** Trial by compurgation was employed primarily in minor criminal matters and civil disputes. The winner was the party who could produce the most or a requisite number of witnesses willing to swear to the truth of his oath. Moore, *supra*, at 27; 3 William Blackstone, *Commentaries on the Law of England: A Facsimile of the First Edition of 1765–1769* 342–44 (1979); Robert von Moschzisker, *Trial by Combat* §§ 43–45, at 34–37 (Bisel 1922).

**9.** Trial by battle was usually between royals represented by "champions." William Forsyth, *History of Trial by Jury* 81 (1875); 3 Blackstone, *supra* note 8, at 337–41; von Moschzisker, *supra* note 8, § 17, at 14.

**10.** If the accused survived unscathed the ordeal of, *e.g.*, inserting his arm into a vat of

In 1166, exactly 100 years after the Conquest, Henry II proclaimed the Assize of Clarendon, banning trials by compurgation and establishing a uniform system of juries to resolve civil and minor criminal disputes; felonies continued to be tried primarily by ordeal. Moore, *supra*, at 35–39; John A. Proffatt, *A Treatise on Trial By Jury, Including Questions of Law and Fact* §§ 25–26, at 37–39 (Riverside 1880). Chapter XXXIX of the Magna Carta,[11] signed in 1215, has been attributed as the source of the right to a trial by a jury of twelve peers. *Thompson v. Utah,* 170 U.S. 343, 349, 18 S.Ct. 620, 622, 42 L.Ed. 1061 (1898), *overruled on other grounds by Collins v. Youngblood,* 497 U.S. 37, 51–52, 110 S.Ct. 2715, 2724, 111 L.Ed.2d 30 (1990); 4 Blackstone, *supra* note 8, at 342–43. However, that theory has largely been rejected by modern scholars. *See, e.g.,* J.C. Holt, *Magna Carta* 327 (1965); Felix Frankfurter & Thomas G. Corcoran, *Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury,* 39 Harv. L.Rev. 917, 922 & n. 14 (1926) (debunking the attribution in *Thompson* as "one of the most revered of legal fables"). Pope Innocent III's ban on trials by ordeal, proclaimed at the Fourth Lateran Council (also in 1215), is regarded as more decisive to the increased employment of jury trials, Theodore F.T. Plucknett, *A Concise History of the Common Law* 118–19 (5th ed.1956), because the abolition of the ordeal left trial by jury as the only logical alternative to deciding serious criminal cases. Morris B. Hoffman, *Peremptory Challenges Should Be Abolished: A Trial Judge's Perspective,* 64 U. Chi. L.Rev. 809, 818–19 (1997). By 1220, trial by jury had become the primary method for determining a defendant's guilt in serious criminal cases. Thomas A. Green, *Verdict According to Conscience* 3 (1985). The jurors, both grand and petit, were most often knights selected by the King's judiciary. Moore, *supra*, at 50, 53–54.

As jury trials flourished in the thirteenth century, the concept of the peremptory challenge—at least for the prosecution—began to take root, particularly in capital cases.[12] Either party could challenge a juror for cause because of a relationship to a litigant by blood, marriage, or economic interest. Jon M. Van Dyke, *Jury Selection Procedures: Our Uncertain Commitment to Representative Panels* 141 (1977). In addition, the Crown could effectively exercise an unlimited

---

scalding water, walking barefoot over hot coals, or being bound and thrown into a body of water, he was declared innocent by intervention of God; otherwise, he was guilty. 4 Blackstone, *supra* note 8, at 336–41; von Moschzisker, *supra* note 8, § 49, at 38–39.

11. "No freeman shall be taken, or imprisoned, or be disseised of his freehold or liberties, or free customs, or be outlawed or exiled, or any otherwise destroyed; nor will we pass upon him, nor condemn him, but by lawful judgment of his peers, or by the law of the land...."

12. Of course, even into the late Middle Ages, most felonies were punishable by death. 4 Blackstone, *supra* note 8, at 95–96. Dickens described the prevalence of the death penalty in the late eighteenth century thusly:

[P]utting to death was a recipe much in vogue with all trades and professions, and not least of all with Tellson's [Bank]. Death is Nature's remedy for all things, and why not Legislation's? Accordingly, the forger was put to Death; the utterer of a bad note was put to Death; the unlawful opener of a letter was put to Death; the purloiner of forty shillings and six pence was put to Death; the holder of a horse at Tellson's door, who made off with it, was put to Death; the coiner of a bad shilling was put to Death; the sounders of three-fourths of the notes in the whole gamut of Crime were put to Death.

Charles Dickens, *A Tale of Two Cities* 62 (Signet 1960).

number of challenges without explanation simply on the basis of royal infallibility, *i.e.*, the challenges ·were irrebuttably presumed to be for a proper purpose. *Id.* at 148. Thus, Judge Hoffman posits that this early English peremptory challenge was more of a hybrid between a peremptory and a challenge for cause. Hoffman, *Peremptory Challenges Should Be Abolished, supra*, at 820–21. In response, some courts began to permit criminal defendants in capital cases to exercise peremptory challenges. By the end of the thirteenth century, it was well settled in the common law that the Crown could exercise an unlimited number of peremptory challenges and the accused could exercise thirty-five. Proffatt, *supra*, § 155, at 207–08.

In 1305, Parliament enacted the Ordinance for Inquests, 33 Edw. 1, Stat. 4, in an attempt to restrict the Crown's power not only to handpick all prospective jurors but also to exercise unlimited peremptory challenges. The Ordinance abolished the Crown's peremptory challenges while establishing by law the accused's right to peremptorily challenge thirty-five jurors. 4 Blackstone, *supra* note 8, at 346–48. The King's courts, however, largely avoided the elimination of the prosecution's peremptory challenges by recognizing a new common law procedure known as "standing aside." By this device, the prosecutor could direct any number of prospective jurors to "stand aside" until each side had exercised all challenges for cause and the accused had exercised all of his or her peremptory challenges. Only if the number of jurors then remaining were insufficient could the jurors "standing aside" be recalled, subject, of course, to challenges for cause. Proffatt, *supra*, §§ 159–160, at 211–13.

After 1305, the number of peremptory challenges allotted to defendants in English criminal trials was gradually reduced from thirty-five to twenty [13] (22 Hen. 8, ch. 14, § 6 (1530); 6 Geo. 4, ch. 50, § 29 (1825)); then to seven (11 & 12 Geo. 6, ch. 58, § 35 (1948)); then to three (The Criminal Law Act, 1977, ch. 45, § 43); until they were finally abolished, along with the "standing aside" procedure, effective January 5, 1989 (The Criminal Justice Act, 1988, ch. 33, § 118(1)).[14]

## II. PEREMPTORY CHALLENGES IN UNITED STATES FEDERAL COURTS.

The colonial courts accepted the English standards of thirty-five peremptory challenges for those accused of treason, twenty for those accused of other felonies, and the "standing aside" practice for prosecutors. Van Dyke, *supra*, at 148. The first draft of the Sixth Amendment to the United States Constitution included, as a corollary

---

**13.** One accused of treason retained the right to thirty-five peremptory challenges.

**14.** The demise of the peremptory challenge in England reportedly was

"the result of a sustained campaign [during the 1980s] in Parliament and in the press alleging that defence counsel were systematically abusing it. In multi-handed trials, it was said, counsel were pooling challenges to 'pack' juries with individuals who were likely to acquit. The Cyprus spy trial was often cited as an example. In that instance *seven jurors were challenged by defence counsel acting together*. The jury, all young and male, acquitted all seven defendants. This case more than any other represented a watershed in the campaign to abolish the challenge, even though critics overlooked the fact that the entire jury panel summoned for the trial had been vetted for the prosecution by Special Branch and MI5."

Raymond J. Broderick, *Why the Peremptory Challenge Should Be Abolished*, 65 Temple L.Rev. 373 n. 17 (1992) (emphasis added) (quoting Sean Enright, *Reviving the Challenge for Cause*, New L.J. 9 (Jan. 6, 1989)).

of the right to an impartial jury, "the right of challenge and other accustomed requisites." S. Mac Gutman, *The Attorney–Conducted Voir Dire of Jurors: A Constitutional Right*, 39 Brook. L.Rev. 290, 297 (1973) (quoting *Journal of the House of Representatives*, compiled by The First Congress Project); *Gazette of the U.S.* 58 (Aug. 29, 1789). This language was ultimately deleted, probably at the urging of James Madison, who believed the Amendment's guarantee of an "impartial jury" was sufficient to include the right to question and challenge jurors.

> "Where a technical word was used [trial by jury], all the incidents belonging to it necessarily attended it. The right to challenge is incident to the trial by jury, and, as one is secured, so is the other."

Gutman, *supra*, at 297 (quoting Madison's remarks regarding the right to trial by jury in criminal cases as guaranteed by Article III, Section 2, during the Virginia ratification debates as reported in Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 531 (2d ed. 1836) (Virginia ratification debate, June 20, 1788)). Patrick Henry disagreed:

> "I would rather the trial by jury were struck out all together. There is no right of challenging partial jurors. There is no common law of America, nor constitution, there can be no right to challenge partial jurors. Yet the right is as valuable as the right to trial by jury itself."

*Id.* (quoting Henry's remarks as reported in Elliot, *supra*, at 541–42). With respect to challenges for cause, Madison's predictions proved true; with respect to peremptory challenges, Henry's predictions ultimately prevailed (at least in the constitutional context).

In 1790, Congress enacted An Act for Punishment of Certain Crimes Against the United States, ch. 9, § 30, 1 Stat. 119 (1790), which explicitly afforded the defendant thirty-five peremptory challenges if charged with treason and twenty if charged with any other capital offense. No provision was made either for peremptory strikes by the prosecution or for the common law practice of "standing aside." However, in dictum in *United States v. Marchant*, 25 U.S. (12 Wheat) 480, 6 L.Ed. 700 (1827), Justice Story indicated that the "standing aside" procedure was a common law right that our federal courts had inherited from the common law of England.

But a still more direct conclusion against the right may be drawn from the admitted right of the crown to challenge in criminal cases, and the practice under that right. *We do not say that the same right belongs to any of the States in the Union; for there may be a diversity in this respect as to the local jurisprudence or practice.* The inquiry here is, not as to what is the State prerogative, but, simply, what is the common law doctrine as to the point under consideration. Until the statute of 33 Edw. 1, the crown might challenge peremptorily any juror, without assigning any cause; but that statute took away that right and narrowed the challenges of the crown to those for cause shown. But the practice since this statute has uniformly been, and it is now clearly settled, not to compel the crown to show cause at the time of objection taken, but to put aside the juror until the whole panel is gone through.

*Id.* at 483, 6 L.Ed. 700 (emphasis added to highlight that jury selection procedures in state courts have always been a state prerogative).

In *United States v. Shackleford*, 59 U.S. (18 How.) 588, 15 L.Ed. 495 (1855), however, the Court held that the Act of 1790, giving the right of peremptory challenge to

the accused, did not "draw along with it" the government's prerogative to exercise the common law right of "standing aside." *Id.* at 590, 15 L.Ed. 495. Thus, after *Shackleford,* federal prosecutors in the United States were in the same predicament as the Crown's prosecutors in England had been after enactment of the Ordinance for Inquests: the accused possessed the right of peremptory challenge; the prosecution did not. The effect of *Shackleford* was not as short-lived as the Ordinance for Inquests had been, perhaps because Congress was more concerned with the preliminaries to and prosecution of the American Civil War than with peremptory challenges. But under the majority opinion's theory that the denial of peremptory challenges is harmless, why would federal prosecutors need them at all?[15]

In 1865, in an apparent if belated response to *Shackleford,* Congress established that in all non-capital felony trials in federal courts the defendant would have ten peremptory challenges and the prosecution would have two, and that in capital cases the defendant would have twenty peremptory challenges and the prosecution would have five. Law of March 3, 1865, ch. 86, § 2, 13 Stat. 500. In 1872, Congress increased the number of prosecutorial peremptory challenges in non-capital cases to three and, for the first time, extended the right of peremptory challenge to civil cases and misdemeanors tried in federal courts (giving each side three). Law of June 8, 1872, ch. 333, § 2, 17 Stat. 282. In 1911, Congress again changed the peremptory challenge numbers: twenty for the defendant and six for the prosecution in capital cases; ten for the defendant and six for the prosecution in non-capital

felony cases; and three each in civil and misdemeanor cases. Law of March 3, 1911, ch. 231, § 287, 36 Stat. 1166. Finally, when the Federal Rules of Criminal Procedure were adopted in 1946, Rule 24(b) increased the prosecution's peremptories in capital cases to equal the defendant's, *i.e.,* twenty. Note that each successive change decreased the peremptory challenges of the accused vis-à-vis those of the prosecution and/or increased the peremptory challenges of the prosecution vis-à-vis those of the accused. As will be noted *infra,* that pattern has been duplicated in Kentucky. In federal civil trials, each party continues to have the right to three peremptory challenges. 28 U.S.C. § 1870.

Prior to 1986, peremptory challenges in the federal courts were regarded as both unconditional and inviolate. "Experience has shown that one of the most effective means to free the jurybox from men unfit to be there is the exercise of the peremptory challenge." *Hayes v. Missouri,* 120 U.S. 68, 70, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887). "The right of challenge ... has always been held essential to the fairness of trial by jury." *Lewis v. United States,* 146 U.S. 370, 376, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892), *abrogated on other grounds by Snyder v. Massachusetts,* 291 U.S. 97, 118 n. 2, 54 S.Ct. 330, 337 n. 2, 78 L.Ed. 674 (1934). "The right to challenge a given number of jurors without showing cause is one of the most important of the rights secured to the accused." *Pointer v. United States,* 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894). Though not constitutional in origin, *Stilson v. United States,* 250 U.S. 583, 586, 40 S.Ct. 28, 30,

---

**15.** Yet, Judge Hoffman reports that an informal poll of lawyers practicing in his court revealed that prosecutors were more zealously protective of the right of peremptory challenge than defense attorneys. Hoffman,

*Peremptory Challenges Should Be Abolished, supra,* at 852–53. One prosecutor is reported to have asserted, "I'd rather get rid of challenges for cause." *Id.* at 852 n. 194.

63 L.Ed. 1154 (1919), the peremptory challenge is "in the nature of a statutory privilege." *Frazier v. United States*, 335 U.S. 497, 505 n. 11, 69 S.Ct. 201, 205 n. 11, 93 L.Ed. 187 (1948). It is a "necessary part of trial by jury ... [because it] allows counsel to ascertain the possibility of bias through probing questions on the *voir dire* and facilitates the exercise of challenges for cause by removing the fear of incurring a juror's hostility through examination and challenge for cause." *Swain v. Alabama*, 380 U.S. 202, 219–20, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965), *overruled by Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

Blackstone offered two rationales for the peremptory challenge:

1. As every one must be sensible, what sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another; and how necessary it is that a prisoner (when put to defend his life) should have a good opinion of his jury, the want of which might totally disconcert him; the law wills not that he should be tried by any one man against whom he has conceived a prejudice, even without being able to assign a reason for such his dislike.

2. Because, upon challenges for cause shown, if the reason assigned prove insufficient to set aside the juror, perhaps the bare questioning his indifference may sometimes provoke a resentment; to prevent all ill consequence from which, the prisoner is still at liberty, if he pleases, peremptorily to set him aside.

4 Blackstone, *supra* note 8, at 347. A party "may have the strongest reasons to distrust the character of a juror offered,

from his habits and associations, and yet find it difficult to formulate and sustain a legal objection to him. In such cases, the peremptory challenge is a protection against his being accepted." *Hayes*, 120 U.S. at 70, 7 S.Ct. at 351.

The essential nature of the peremptory challenge is that it is one exercised *... without being subject to the court's control*. While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable.

*Swain*, 380 U.S. at 220, 85 S.Ct. at 836 (emphasis added) (citations omitted).

Peremptory challenges are often premised upon "experienced hunches and educated guesses." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 148, 114 S.Ct. 1419, 1431, 128 L.Ed.2d 89 (1994) (O'Connor, J., concurring). "[M]any jurors during voir dire may not give a party an articulable reason to challenge them for cause, though the party instinctively senses hostility from the prospective juror." Robert T. Prior, *The Peremptory Challenge: A Lost Cause?*, 44 Mercer L.Rev. 579, 582 (1993). "That a trial lawyer's instinctive assessment of a juror's predisposition cannot meet the high standards of a challenge for cause does not mean that the lawyer's instinct is erroneous." *J.E.B.*, 511 U.S. at 148, 114 S.Ct. at 1431 (O'Connor, J., concurring). One commentator describes a peremptory challenge as "one based on evidence that persuades the attorney, but is insufficient to persuade the judge" that a potential juror is biased against the litigant or his or her position.[16] Anthony Page, *Batson's Blind Spot: Unconscious*

16. As a practicing attorney some thirty years ago, I was retained to assist in defending the City of Bardstown, in neighboring Nelson County, in a personal injury lawsuit that arose out of a collision between a city fire truck and another motorist. My co-counsel

*Stereotyping and the Peremptory Challenge*, 85 B.U. L.Rev. 155, 158 (2005).

Prior to *Ross v. Oklahoma* and *United States v. Martinez–Salazar*, the only restriction on a party's use of a peremptory challenge was that it could not be employed for purposeful discrimination against a class of jurors on the basis of race, gender, or ethnic origin. In 1986, the United States Supreme Court held in *Batson v. Kentucky* that the peremptory challenge was not entirely peremptory but was subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[17] *Batson*, 476 U.S. at 89, 106 S.Ct. at 1719. Specifically, the Court held that a prosecutor could not use peremptory challenges to excuse jurors "solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.*[18] The Court later extended that holding to purposeful discrimination on the basis of ethnic origin, *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (as stated in *Martinez–Salazar*, 528 U.S. at 315, 120 S.Ct. at 781), and gender, *J.E.B.*, 511 U.S. at 130–31, 114 S.Ct. at 1422. The *Batson* prohibition against the discriminatory use of peremptory challenges has been extended to civil cases, *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 630, 111 S.Ct. 2077, 2088, 114 L.Ed.2d 660 (1991), and to peremptory challenges exercised by criminal defendants, *Georgia v. McCollum*, 505 U.S. 42, 59, 112 S.Ct. 2348, 2359, 120 L.Ed.2d 33 (1992). Because *Batson* was premised not only on purposeful discrimination against the opposing party but also on purposeful discrimination against the excluded jurors, 476 U.S. at 87–88, 106 S.Ct. at 1718, a party can raise a *Batson* objection even if that party is not of the same race, gender, or ethnic origin as the excluded jurors. *Powers v. Ohio*, 499 U.S. 400, 416, 111 S.Ct. 1364, 1373–74, 113 L.Ed.2d 411 (1991).

However, the *Batson* line of cases does not purport to *deprive* a party of a per-

---

was the city attorney. At the conclusion of voir dire, I suggested that we use our three peremptory challenges to excuse the plaintiff's Sunday School teacher, her childhood schoolmate, and a lady who had litigated her own personal injury case to a successful conclusion. My co-counsel pointed out that he had previously represented the ex-wives of two prospective jurors in their divorce proceedings and had prosecuted to conviction the son of another prospective juror for drunk driving. The Sunday School teacher, the childhood schoolmate, and the previously successful plaintiff remained on the jury. The city needed six peremptory challenges, not three. If the trial court had allotted six peremptories to the city and only three to the plaintiff, today's majority opinion would deem that allotment "harmless error" unless the plaintiff could prove that a biased juror actually sat on the jury. *Sand Hill Energy, Inc. v. Ford Motor Co.*, 83 S.W.3d 483, 497–501 (Ky. 2002) (Keller, J., concurring), *cert. granted and judgment vacated by Ford Motor Co. v.*

*Smith*, 538 U.S. 1028, 123 S.Ct. 2072, 155 L.Ed.2d 1056 (2003).

17. Although *Batson* was premised on the Fourteenth Amendment, which is applicable only to states, its holding has been held to apply as well to federal trials because "the Fifth Amendment's due process clause, applicable to the United States, has been construed to implicitly include an equal protection guaranty generally as broad as that of the Fourteenth Amendment." *United States v. Leslie*, 813 F.2d 658, 659 (5th Cir.1987) (citing *Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976) (per curiam) ("Equal Protection Analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.")).

18. Presumably, *Batson* also extends to non-minority races, *e.g.*, Caucasians, *see Caudill v. Commonwealth*, 120 S.W.3d 635, 657 (Ky. 2003), though the United States Supreme Court has yet to address the issue.

emptory challenge or to require that a challenge be exercised to correct judicial error; those cases only preclude a party from utilizing a peremptory challenge for a discriminatory purpose. "Absent intentional discrimination violative of the Equal Protection Clause, parties should be free to exercise their peremptory strikes for any reason, or no reason at all." *Hernandez*, 500 U.S. at 374, 111 S.Ct. at 1874 (O'Connor, J., concurring).

The only United States Supreme Court case purporting to require a party to use a peremptory challenge to correct judicial error is *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and it was applying Oklahoma law to a case tried in an Oklahoma court.

It is a long settled principle of Oklahoma law that a defendant who disagrees with the trial court's ruling on a for-cause challenge must, in order to preserve the claim that the ruling deprived him of a fair trial, exercise a peremptory challenge to remove the juror. Even then, the error is grounds for reversal only if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him . . . .

Thus, although Oklahoma provides a capital defendant with nine peremptory challenges, this grant is qualified by the requirement that the defendant must use those challenges to cure erroneous refusals by the trial court to excuse jurors for cause . . . .

. . . .

As required by Oklahoma law, petitioner exercised one of his peremptory challenges to rectify the trial court's error, and consequently he retained only eight peremptory challenges to use in his unfettered discretion. But he received all that Oklahoma law allowed him, and therefore his due process challenge fails.

*Id.* at 89–91, 108 S.Ct. at 2279–80. The Court specifically left open "the broader question whether, in the absence of Oklahoma's limitation on the 'right' to exercise peremptory challenges, 'a denial or impairment' of the exercise of peremptory challenges occurs if the defendant uses one or more challenges to remove jurors who should have been excused for cause." *Id.* at 91 n. 4, 108 S.Ct. at 2280 n. 4. That question was addressed with respect to federal law in *United States v. Martinez–Salazar*, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), which held that to preserve such an error for appeal, the defendant must leave the juror on the jury, suffer a conviction at the hands of the resultant biased jury, and pursue a Sixth Amendment argument on appeal. *Id.* at 315, 120 S.Ct. at 781. *Martinez–Salazar* also purported to reject for federal courts the Oklahoma requirement that a criminal defendant must use his or her peremptory challenges to cure the trial court's error, *id.* at 314–15, 120 S.Ct. at 781, though the practical result of its holding is the same.

## III. PEREMPTORY CHALLENGES IN KENTUCKY COURTS.

In concluding that the ineffective allocation of peremptory challenges to any party, civil or criminal, may be "harmless error," the majority acts without due consideration for the significance with which Kentucky law and jurisprudence have regarded this right since the late 1700s.

Initially, criminal defendants had a statutory right to twenty-four peremptory challenges if charged with treason and twenty if charged with "murder or felony." Act of December 17, 1796, 1 William Littell, Statute Law of Kentucky ("Littell's Laws"), ch. 262, § 19, pp. 469–70 (1809). This right was broadened by statute to twenty peremptory challenges in "all criminal cases whatsoever," except in courts

where "penal" offenses—those subject only to pecuniary penalty—were prosecuted.[19] Act of December 22, 1798, 1 Littell's Laws, ch. 169, p. 236 (1810) ("except in courts of quarterly sessions"). During this time the prosecution was not entitled to any peremptory challenges. Act of December 17, 1796, 1 Littell's Laws, ch. 262, § 18, p. 469; *Commonwealth v. Bailey*, 30 Ky. (7 J.J. Marsh.) 246 (1832). However, this omission was substantially counterbalanced by the fact that, whereas a writ of error or an appeal could be taken to the Court of Appeals[20] from a civil or "penal" case, a writ of error or an appeal could not be taken from any other criminal case. Act of December 19, 1796, 1 Littell's Laws, ch. 277, § 13, p. 563 (no certiorari, appeal, supersedeas, or writ of error allowed from district court[21] judgments in criminal cases). The logic behind denying the right of appeal in serious criminal cases was simple: swift justice.[22]

At first blush, the distinction between allowing appeals in "penal cases" but not in other criminal cases may have been because the accused in other criminal cases was allowed twenty peremptory challenges—and was expected to use them to correct judicial error. The following language in *Montee v. Commonwealth*, 26 Ky. (3 J.J. Marsh.) 132 (1830), appears to support this position.

It would seem, therefore, that the most safe and consistent conclusion, is, that the right of peremptorily challenging twenty, does not exist in "penal cases," but is allowed, in all other criminal cases, and that the right to prosecute a writ of error, is given in a penal, but in no other criminal case.

*Id.* at 144–45.

However, while there had been no *statutory* right to peremptory challenges in trials of "penal" offenses (those tried in the courts of quarterly sessions), *Montee* also held that "[a]n equitable and reasonable construction, will extend the same right of peremptory challenge, to 'penal cases,' as that which is allowed in [civil] cases," *i.e.*, the right to three peremptory challenges. *Id.* at 149. Thus the reason for a party's right to its allotted peremptory challenges could not have been because there was no right to appeal. In "penal" cases, the accused had both the right to peremptory challenges (albeit only three) and the right to appeal. Furthermore, in *Pryor v. Commonwealth*, 32 Ky. (2 Dana) 298 (1834), the

---

19. Prior to 1802, all "penal" cases were tried in the court of quarterly sessions—a court of limited jurisdiction; the district court was a court of general jurisdiction. In 1802, district courts and courts of quarterly sessions were abolished and their jurisdiction transferred to circuit courts. Act of December 20, 1802, 3 Littell's Laws, ch. 23, §§ 1, 7, 27, 32, pp. 37–48 (1811).

20. Prior to 1976, our highest court was the "Court of Appeals." Upon adoption of the Judicial Article that Court became the Supreme Court. 1974 Ky. Acts, ch. 84, § 2(1), (8).

21. After the court of quarterly sessions and the district court were merged into the circuit court, *see* note 20, *supra*, our predecessor

court held that a writ of error could be taken from circuit court in a penal case, over which the court of quarterly sessions previously had jurisdiction, but not in other criminal cases, over which the district court previously had jurisdiction. *Montee v. Commonwealth*, 26 Ky. (3 J.J. Marsh.) 132, 146 (1830).

22. Chief Justice Robertson explained:

The reason for not tolerating writs of error, in criminal cases, punishable by corporal infliction, may be, because such a proceeding, would, in such cases, not only be unusual, but inconvenient, oppressive, and in some degree, *subversive of the exigencies, and end of inflicting corporal punishment.*

*Montee,* 26 Ky. (3 J.J. Marsh.) at 144–45 (emphasis added).

court held that it was reversible error to deny the defendant three peremptory challenges in a "penal" case even though the defendant could prosecute a writ of error in such a case. *Id.* at 299. Sixteen years later, after the intervening enactment of a statute authorizing prosecution of a writ of error in any criminal case punishable by fine *or by fine and imprisonment,* Act of 1841, 3 Stat. Law 37, the court held that it was reversible error to deny a defendant twenty peremptory challenges in the trial of any criminal charge that could result in imprisonment. *Hayden v. Commonwealth,* 49 Ky. (10 B. Mon.) 125, 126 (1850).

With respect to civil litigation, an Act of December 27, 1806, 3 Littell's Laws, ch. 397, § 1, p. 402 (1811), provided that "each party litigant shall have the right of peremptory challenge to one fourth of the jury summoned." In *Sodousky v. McGee,* 27 Ky. (4 J.J. Marsh.) 267 (1830), a civil action for assault and battery, our predecessor court interpreted "parties litigant" to mean antagonistic sides of the controversy; thus, it was not error to deny separate peremptory challenges to nine non-antagonistic defendants. In *Clarke v. Goode,* 29 Ky. (6 J.J. Marsh.) 637 (1831), however, the Court held that it was reversible error to deny a civil litigant the right to exercise all three peremptory challenges allotted to him. "It is not only important that justice should be impartially administered, but where it can be effected without the violation of any rule of propriety, that it should flow through channels as clear from suspicion as possible." *Id.*

Thus, in our earliest jurisprudence, it was well established that a criminal defendant's or a civil litigant's right to the per-

emptory challenges allowed by law was inviolate.

In 1854, the General Assembly officially adopted the first Criminal Code of Practice. M.C. Johnson et al., *Code of Practice in Criminal Cases* (eff. July 1, 1854).[23] Section 203 of the Code allotted to the defendant twenty peremptory challenges in a felony prosecution and three in a misdemeanor prosecution; section 204 allotted to the Commonwealth five peremptory challenges in a felony prosecution and three in a misdemeanor prosecution. Section 327 gave the Court of Appeals appellate jurisdiction over felony convictions, "subject to the restrictions contained in this article." In that respect, Section 334 provided that a judgment of conviction of a felony could only be reversed on the following grounds:

1st An error of the court in admitting or rejecting important evidence.

2d An error in instructing or refusing to instruct the jury.

3d An error in failing to arrest the judgment.

4th *An error in allowing or disallowing a peremptory challenge.*

(Emphasis added.) Section 349(1) specifically provided that an error in allowing or overruling a challenge for cause was not grounds for reversal. Section 276, which later became section 281, 1876 Ky. Acts (eff. January 1, 1877), Joshua F. Bullitt & John Feland, *Code of Practice in Kentucky Criminal Cases* 3, 52 (1876), provided that "[t]he decision of the court on challenges to the panel, and for cause, *shall not be subject to exception.*" (Emphasis added.)

---

**23.** This and subsequent editions of the Criminal Code governed criminal practice in Kentucky from 1854 until 1962, when the General Assembly repealed the last Criminal Code, 1962 Ky. Acts, ch. 234, § 62(2), and replaced

it with the Rules of Criminal Procedure, *id.* § 0, subject to future amendments and the rule-making authority of the Judicial Department. *Id.,* pmbl.

In *Moore v. Commonwealth*, 70 Ky. (7 Bush) 191 (1870), our predecessor court held that section 334 of the Criminal Code precluded it from reviewing a trial court's allegedly erroneous failure to strike a juror for cause (oddly failing to also cite section 349(1)), rejecting an argument that the effect of the error was to disallow the appellant a peremptory challenge so as to authorize an appeal under section 334(4). Shortly thereafter, the General Assembly repealed section 349(1) and amended section 344 to read: "A judgment of conviction shall be reversed for any error of law to the defendant's prejudice appearing of record."[24] Despite the General Assembly's obvious attempt to overrule *Moore*, our predecessor court consistently interpreted section 281, which precluded only "exceptions" to trial court decisions "on challenges to the panel, and for cause," as precluding the right to appeal an erroneous failure to grant an excusal for cause. *See, e.g., Conley v. Commonwealth*, 225 Ky. 275, 8 S.W.2d 415, 417 (1928); *Harris v. Commonwealth*, 214 Ky. 787, 283 S.W. 1063, 1065 (1926); *Lake v. Commonwealth*, 209 Ky. 832, 273 S.W. 511, 512–13 (1925) (also holding that section 281 did not violate Section 11 of the Constitution of Kentucky); *McKinzie v. Commonwealth*, 193 Ky. 781, 237 S.W. 386, 387 (1922); *Lawler v. Commonwealth*, 182 Ky. 185, 206 S.W. 306, 309 (1918) (applying section 281 to deny review of prosecutor's admittedly improper advice to jurors during *voir dire* that, if convicted of murder, the defendant would be eligible for parole in eight years); *Barnes v. Commonwealth*, 70 S.W. 827, 828 (Ky.1902); *Gilbert v. Commonwealth*, 51 S.W. 590, 590–91 (Ky.1899); *Burton v. Commonwealth*, 11 Ky. Op. 841 (1882);

*Rutherford v. Commonwealth*, 76 Ky. (13 Bush) 608, 609–10 (1878).

Several of these opinions noted in passing that the trial court's erroneous failure to excuse a juror for cause could not have been prejudicial because the defendant failed to show that he had exhausted all of his peremptory challenges. *Conley*, 8 S.W.2d at 417; *Lake*, 273 S.W. at 513; *Gilbert*, 51 S.W. at 591. That was the harmless error rule prevailing in civil cases to which, of course, section 281 of the Criminal Code did not apply. *Day's Comm. v. Exch. Bank of Ky.*, 116 S.W. 259, 259–60 (Ky.1909).

In 1932, the General Assembly once again attempted to make the erroneous denial of challenges for cause appealable, this time amending section 281 to read: "The decision of the court upon challenges, *and for cause*, or upon motions to set aside the indictment, *shall be subject to exception.*" 1932 Ky. Acts, ch. 63, § 2 (emphasis added). Shortly thereafter, our predecessor court held that it would find the erroneous failure to excuse a juror for cause to be harmless unless the juror actually served on the case or the defendant excused the juror peremptorily and exhausted all of his or her peremptory challenges in the process. *Tate v. Commonwealth*, 258 Ky. 685, 80 S.W.2d 817, 820 (1935). Except for some unfortunate dictum in *Turpin v. Commonwealth*, 780 S.W.2d 619, 621 (Ky.1989), and a short-lived holding in *Dunbar v. Commonwealth*, 809 S.W.2d 852, 853 (Ky.1991), that was premised upon the absence of a Constitutional guarantee of peremptory strikes (a holding that was quickly rejected in *Thomas*, 864 S.W.2d at 258–60, as an incorrect

24. 1876 Ky. Acts, (eff. January 1, 1877), Bullitt & Feland, *supra*, at 3, 61, 65 (1876). By an Act of March 4, 1880, section 340 was again amended to add additional harmless error language, *i.e.*, "where, upon consider-

ation of the whole case, the court is satisfied that the substantial rights of the defendant have been prejudiced thereby." 1880 Ky. Acts, § 360, p. 42.

interpretation of *Ross v. Oklahoma*), we and our predecessor court have consistently applied the rule announced in *Tate* during the ensuing seventy years. *Derossett v. Commonwealth*, 867 S.W.2d 195, 197 (Ky.1993); *Smith v. Commonwealth*, 734 S.W.2d 437, 444 (Ky.1987); *Lefevers v. Commonwealth*, 558 S.W.2d 585, 587–88 (Ky.1977); *Rigsby v. Commonwealth*, 495 S.W.2d 795, 798–99 (Ky.1973), *overruled on other grounds by Pendleton v. Commonwealth*, 685 S.W.2d 549, 552 (Ky.1985); *Jones v. Commonwealth*, 281 S.W.2d 920, 925 (Ky.1955); *Messer v. Commonwealth*, 297 Ky. 772, 181 S.W.2d 438, 440 (1944). The same rule also applies in civil cases. *Commonwealth, Dep't. of Highways v. Ginsburg*, 516 S.W.2d 868, 870–71 (Ky. 1974); *Carrithers v. Jean's Ex'r*, 249 Ky. 695, 61 S.W.2d 323, 325 (1933); *Day's Comm.*, 116 S.W. at 259–60.

Conversely, our courts also have consistently held that the erroneous denial of a challenge for cause is prejudicial and requires reversal for a new trial *if* the defendant used a peremptory challenge to excuse the juror and exhausted all of his or her peremptory challenges in the process. *Fugate v. Commonwealth*, 993 S.W.2d 931, 938 (Ky.1999); *Thomas*, 864 S.W.2d at 259; *Thompson v. Commonwealth*, 862 S.W.2d 871, 874–75 (Ky.1993) (death penalty case), *overruled on other grounds by St. Clair v. Commonwealth*, 140 S.W.3d 510, 570 (Ky. 2004), *superseded by rule on other grounds as recognized by Perdue v. Commonwealth*, 916 S.W.2d 148, 159 (Ky.1995); *Alexander v. Commonwealth*, 862 S.W.2d 856, 864–65 (Ky.1993), *overruled on other grounds by Stringer v. Commonwealth*, 956 S.W.2d 883, 891 (Ky.1997); *Montgomery v. Commonwealth*, 819 S.W.2d 713, 717–18 (Ky.1991); *Morris v. Commonwealth*, 766 S.W.2d 58, 60 (Ky.1989) (failure to excuse for cause jurors who would only consider the death penalty); *Grooms v. Commonwealth*, 756 S.W.2d 131, 138

(Ky.1988) (failure to excuse for cause juror who would not consider full range of penalties); *Marsch v. Commonwealth*, 743 S.W.2d 830, 831 (Ky.1987); *Brumfield v. Commonwealth*, 374 S.W.2d 499, 500 (Ky. 1964) (some jurors who should have been excused for cause actually served because defendant exhausted his peremptory challenges on other jurors who also should have been excused for cause); *Tayloe v. Commonwealth*, 335 S.W.2d 556, 557 (Ky. 1960) (same); *Calvert v. Commonwealth*, 708 S.W.2d 121, 123 (Ky.App.1986); *Godsey v. Commonwealth*, 661 S.W.2d 2, 4–5 (Ky.App.1983).

The same rule has also been applied in civil cases, now governed by CR 47.03. *Bowman ex rel. Bowman v. Perkins*, 135 S.W.3d 399, 402 (Ky.2004) (plurality opinion); *Conner v. Denney*, 521 S.W.2d 514, 515 (Ky.1975); *Davenport v. Ephraim McDowell Hosp.*, 769 S.W.2d 56, 59 (Ky. App.1988) (reversing without specifically reporting that the aggrieved party exhausted all peremptories—if not, then holding that erroneous denial of challenge for cause is reversible error even if litigant failed to exhaust all peremptories). *Ginsburg*, 516 S.W.2d at 870–71, *Carrithers*, 61 S.W.2d at 323, and *Day's Committee*, 116 S.W. at 259–60, also clearly implied that such would have been the result had the party exhausted all peremptory challenges.

We and our predecessor court have long held that the right to have peremptory challenges allotted according to law in a civil case is a "substantial right." *See, e.g., Bowling Green Mun. Utils. v. Atmos Energy Corp.*, 989 S.W.2d 577, 580 (Ky.1999); *Ky. Farm Bureau Mut. Ins. Co. v. Cook*, 590 S.W.2d 875, 877 (Ky.1979); *Eads v. Stockdale*, 310 Ky. 446, 220 S.W.2d 971, 972 (1949); *Olympic Realty Co. v. Kamer*, 283 Ky. 432, 141 S.W.2d 293, 297 (1940); *Drury v. Franke*, 247 Ky. 758, 57 S.W.2d 969, 984–85 (1933); *Pendly v. Ill. Cent.*

*R.R. Co.*, 92 S.W. 1, 2 (Ky.1906) ("When they were permitted to remove six jurors, a substantial right of the appellant was taken from her."). Thus, our courts have consistently held that the denial or misallocation of peremptory challenges, when properly preserved, is *per se* reversible error. "[W]hen the error is properly preserved, reversal and a new trial should be awarded as a matter of law." *Cook*, 590 S.W.2d at 877.

This has been the law of Kentucky in both civil and criminal cases since 1834. *Atmos Energy*, 989 S.W.2d at 580 ("Violations of CR 47.03, in order to be subject to appellate reversal, need not show actual prejudice. A simple violation suffices."); *Wells v. Conley*, 384 S.W.2d 496, 498 (Ky. 1964); *Roberts v. Taylor*, 339 S.W.2d 653, 656 (Ky.1960); *Price v. Bates*, 320 S.W.2d 786, 788 (Ky.1959); *Williams v. Whitaker*, 293 S.W.2d 627, 628 (Ky.1956); *Pendly*, 92 S.W. at 2; *Hayden*, 49 Ky. (10 B. Mon.) at 126; *Pryor*, 32 Ky. (2 Dana) at 298; *Clarke*, 29 Ky. (6 J.J. Marsh.) at 638; *Davenport*, 769 S.W.2d at 59 ("Granting the two non-antagonistic appellees six peremptory strikes was reversible error as a matter of law.").

> When the right of challenge is lost or impaired, the statutory conditions and terms for setting up an authorized jury are not met; the right to challenge a given number of jurors without showing cause is one of the most important rights to a litigant; any system for the empaneling of a jury that prevents or embarrasses the full, unrestricted exercise of the right of challenge must be condemned; ... the right to reject jurors by peremptory challenge is material in its tendency to give the parties assurance of the fairness of a trial in a valuable and effective way; *the terms of the statutes with reference to peremptory challenges are substantial rather than technical; such rules, as aiding to se-*

> *cure an impartial, or avoid a partial, jury, are to be fully enforced;* ... next to securing a fair and impartial trial for parties, it is important that they should feel that they have had such a trial, and anything that tends to impair their belief in this respect must seriously diminish their confidence and that of the public generally in the ability of the state to provide impartial tribunals for dispensing justice between its subjects.

*Drury v. Franke*, 247 Ky. 758, 57 S.W.2d 969, 984 (1933) (emphasis added) (applying rule to prospective juror's failure to respond to voir dire question, thus precluding litigant from opportunity to excuse juror by peremptory challenge).

The United States Supreme Court has also recognized that some errors at trial cannot be analyzed under the harmless error standard.

> In *Fulminante [Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)]*, we distinguished between; on the one hand, "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards," 499 U.S., at 309, 111 S.Ct., at 1265, and, on the other hand, trial errors which occur "during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented," *id.*, at 307–308, 111 S.Ct., at 1252, 1264.

*Sullivan v. Louisiana*, 508 U.S. 275, 281, 113 S.Ct. 2078, 2082–83, 124 L.Ed.2d 182 (1993). In other words, errors which occur during the presentation of the case to the jury can be evaluated for prejudicial effect by examining whether the introduction of other evidence diminished the gravity of the error. However, errors in the structure of the trial, such as allotting a

party fewer peremptory challenges than allowed by law, defy such analysis.[25]

When the State has more peremptory challenges than the accused, the State has an unmistakable tactical advantage and the impartiality of the jury is compromised. Errors which affect the impartiality of the jury are, by definition, structural and require reversal.

*State v. Good,* 309 Mont. 113, 43 P.3d 948, 961 (2002).

If Appellant had been able to use the wasted peremptory challenge to excuse another objectionable (to him) juror, thus changing the composition of the jury, would the outcome have been more favorable to him—either with respect to guilt or punishment? That type of issue is incapable of proof, thus unsusceptible to harmless error analysis.

The requirement of a showing of actual prejudice effectively nullifies the requirements of the rule on allocation of peremptory challenges. To show actual prejudice, the complaining litigant would be required to discover the unknowable and to reconstruct what might have been and never was, a jury properly constituted after running the gauntlet of challenge performed in accordance with the prescribed rule of the game.

*Cook,* 590 S.W.2d at 877. In other words, proving prejudice from the loss of a peremptory strike "is like *ignis fatuus,* a will o' the wisp incapable of proof." *Sand Hill Energy, supra* note 16, at 510 (Cooper, J., dissenting).

As noted in the majority opinion, the number of peremptory challenges allotted to criminal defendants in felony cases in Kentucky has gradually diminished vis-à-vis those granted to the prosecution: from the original twenty for the defense and none for the prosecution prior to 1854, to twenty and five from 1854 until 1893, Johnson et al., *supra,* §§ 203, 204; to fifteen and five from 1893 to 1978, John D. Carroll, *Code of Practice in Criminal Cases* §§ 203, 204 (1893); 1962 Ky. Acts, ch. 234, § 0, Rule 9.40; to eight and five from 1978 to 1994, RCr 9.40(1); Order Amending Rules, Administrative Procedures of the Court of Justice, Part II, Jury Selection and Management, at 20 (eff.Jan. 1, 1978); and finally to eight and eight, until today. RCr 9.40(1); Order Amending Rules of Civil Procedure (CR), Rules of Criminal Procedure (RCr), Rules of Supreme Court (SCR), 94–1, at 8 (eff.Oct. 1, 1994). That does not mean that entitlement to the number allotted by law is no longer a "substantial right." It only means that the General Assembly and, subsequently, this Court have gradually recognized that in criminal cases, as has always been true in civil cases, there should be a level playing field between prosecution and defense. The purpose of specifically limiting and allocating peremptory strikes by statute or rule is so one side cannot unfairly "stack the deck" against the other. *Holland v. Illinois,* 493 U.S. 474, 481, 110 S.Ct. 803, 807–08, 107 L.Ed.2d 905 (1990). "[I]f one party is allowed more peremptory challenges than the other, he is in effect, given an advantage in that he may select by indirection particular veniremen to try his cause." *Williams v. Pichard,* 150 Fla. 371, 7 So.2d 468 (1942). It is particularly egregious to place a criminal defendant at such a disadvantage. "Between him and the state the scales are to be evenly held." *Hayes v. Missouri,* 120 U.S. 68, 70, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887).

---

**25.** The United States Supreme Court has never addressed whether the failure to allocate peremptory challenges according to law is a structural error. That, of course, does not mean that Kentucky cannot do so.

No longer. Because of our decision today, peremptory challenges in both civil and criminal trials can be allocated at the whim of trial judges, who can control their allotment either by refusing to grant challenges for cause and thereby forcing the aggrieved party to waste his/her/its peremptory strikes on jurors who should have been excused for cause, or by simply misallocating the peremptory challenges by awarding a party more than or less than the number allowed by law. Either action will be deemed "harmless error" unless that aggrieved party can prove that a biased juror actually sat on the case—an improbable feat. "Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard ... against the compliant, biased, or eccentric judge." *Duncan v. Louisiana*, 391 U.S. 145, 156, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491 (1968). Every experienced trial lawyer has a "war story" about a local judge who "took care of his 'home folks.'" We were required to reverse *Atmos Energy*, a case involving multiple plaintiffs with identical interests and multiple defendants with antagonistic interests, because the trial judge equalized the peremptory strikes "as a matter of fairness." 989 S.W.2d at 579. After today, such whimsical rulings will be deemed "harmless error." What if the trial judge is a former prosecutor whose mind-set has not yet switched to neutral, so he ignores the mandate of *Montgomery v. Commonwealth*, 819 S.W.2d at 718, that trial judges "remove [the 'magic question'] from their thinking and strike it from their lexicon," and requires a defendant to use peremptory challenges to excuse one or more "rehabilitated" jurors whom *Montgomery* would

require to be excused for cause? [26] Harmless error.

"If one of an accused's peremptory challenges could be taken away from him, why not five be taken, and if five, why not ten, leaving none ...."

*Johnson v. State*, 43 S.W.3d 1, 6 (Tex. Crim.App.2001) (quoting *Wolfe v. State*, 147 Tex.Crim. 62, 178 S.W.2d 274, 279–80 (1944)).

To permit peremptory strikes to be allocated arbitrarily and inconsistently on a case-by-case, court-by-court basis would be intolerable. It would be better to abolish peremptory strikes than to permit them to become ... the tool of judicial arbitrariness.

*Sand Hill*, 83 S.W.3d at 512 (Cooper, J., dissenting).

## IV. AFTERMATH OF MARTINEZ–SALAZAR.

As noted *supra*, *Martinez–Salazar* applies only to federal courts and is not binding on the states. In the five years since it was decided, nine states have abandoned the *per se* reversible error rule and embraced its reasoning. *Dailey v. State*, 828 So.2d 340, 344 (Ala.2001); *State v. Hickman*, 205 Ariz. 192, 68 P.3d 418, 427 (2003); *State v. Santana*, 135 Idaho 58, 14 P.3d 378, 384 (2000); *State v. Entzi*, 615 N.W.2d 145, 149 (N.D.2000); *Green v. Maynard*, 349 S.C. 535, 564 S.E.2d 83, 86 (2002); *State v. Verhoef*, 627 N.W.2d 437, 441–42 (S.D.2001); *State v. Fire*, 145 Wash.2d 152, 34 P.3d 1218, 1225 (2001); *State v. Lindell*, 245 Wis.2d 689, 629 N.W.2d 223, 250–51 (2001); *Klahn v. State*, 96 P.3d 472, 483–84 (Wyo.2004).

On the other hand, eleven state courts, six since 2002, have declined to follow the

---

**26.** In fact, we were recently presented with this exact scenario in another appeal from this same circuit, apparently because an insufficient number of jurors were available to permit excusals for cause. *Dickerson v. Commonwealth*, 174 S.W.3d 451, 461 n. 3 (Ky. 2005).

reasoning of *Martinez–Salazar*, specifically retaining the *"per se* reversible" rule. *People v. Lefebre*, 5 P.3d 295, 307 (Colo. 2000) (rejecting *Martinez–Salazar* and holding that "[o]ur decisions have consistently recognized that, under Colorado law, a defendant suffers reversible prejudice if he is forced to use a peremptory challenge to remove a juror whom the trial court failed to remove for cause and he exhausts his peremptory challenges"); *Busby v. State*, 894 So.2d 88, 96–105 (Fla. 2004) (rejecting *Ross* and *Martinez–Salazar* and retaining its rule that the failure to excuse for cause is reversible error *per se* if the defendant exhausts peremptories and identifies a juror he would have peremptorily excused if he had not exhausted peremptories); *Fortson v. State*, 277 Ga. 164, 587 S.E.2d 39, 41 (2003) (ignoring dissent's urging that *Martinez–Salazar* be applied and recognizing that "causing a defendant to unnecessarily use a peremptory strike on a juror that should have been excused for cause is per se harmful error"); *State v. Taylor*, 875 So.2d 58, 62 (La.2004) (noting that *Martinez–Salazar* follows a different rule than is followed in Louisiana); *State v. McLean*, 815 A.2d 799, 805 (Me.2002) ("[W]hen a defendant's right to have jurors selected in the manner prescribed by the Rules is impaired, as it was in this case, it would be virtually impossible for the State to show after conviction that the injury to the defendant is harmless, and equally difficult for the defendant to demonstrate prejudice."); *Whitney v. State*, 158 Md.App. 519, 857 A.2d 625, 633 (2004) ("Although the Supreme Court in *Martinez–Salazar* has clarified as dictum the statement from *Swain* that the impairment of a federal defendant's peremptory challenges dictates reversal *per se*, we discern no effort by the courts of this State to retreat from the 'reversibility *per se*' rule for the judicial impairment of a party's allotment of peremptory strikes.").

*See also State v. Good*, 309 Mont. 113, 43 P.3d 948, 959–60 (2002) (prejudice presumed if juror should have been excused for cause, defendant used peremptory strike to excuse juror, and defendant exhausted all peremptory strikes—structural error not subject to harmless error analysis); *People v. Cahill*, 2 N.Y.3d 14, 777 N.Y.S.2d 332, 809 N.E.2d 561, 578 (2003) ("An erroneous denial of a defendant's challenge for cause is not rendered 'harmless' because the defense later excuses the juror peremptorily. To the contrary, the defendant's loss of the peremptory challenge constitutes the harm." (Citations omitted.)); *Hanson v. State*, 72 P.3d 40, 48–49 (Okla.Crim.App.2003) (reversal required where one juror should have been removed for cause, and defendant exhausted all peremptories and identified additional juror he would have stricken (objectionable but not removable for cause) with the lost peremptory); *Johnson v. State*, 43 S.W.3d at 10–11 (Johnson, J. concurring) ("[T]he primary rationale for peremptory challenges in federal court ... [is] 'to help secure the constitutional guarantee of trial by an impartial jury,' *Martinez–Salazar*, 528 U.S. at 316, 120 S.Ct. at 782. ... [W]e have consistently reversed convictions and ordered a new trial when ... the trial court improperly denied a challenge for cause and thereby forced the defendant to use a peremptory challenge ... to correct error by the trial court."); *Brown v. Commonwealth*, 33 Va.App. 296, 533 S.E.2d 4, 8 n. 2 (2000) (prejudicial error occurs when a trial court forces a defendant to use a peremptory challenge afforded him by statute to excuse a juror who should have been excused for cause, rejecting *Martinez–Salazar*).

It is generally accepted by jurisdictions operating under *Martinez–Salazar*'s regi-

men that its principles apply to civil actions as well as to criminal prosecutions. *Thompson v. Altheimer & Gray*, 248 F.3d 621, 623–24 (7th Cir.2001) ("*Martinez–Salazar* was a criminal case but we cannot think of any difference which that would make."); *Walzer v. St. Joseph State Hosp.*, 231 F.3d 1108, 1111 (8th Cir.2000) (applying *Martinez–Salazar* to a Title VII action); *cf. Cruz v. Jordan*, 357 F.3d 269, 271 (2d Cir.2004) (deciding issue on other grounds but noting that "we see no reason why *Martinez–Salazar* would not apply to Cruz's civil claim"). Indeed, Justice Keller, who is accurately identified by the majority opinion as having first advanced this notion in Kentucky, assumed it would apply to both civil and criminal cases, and to both the erroneous failure to grant a challenge for cause and the failure to allocate peremptories according to law. *Sand Hill*, 83 S.W.3d at 497–501 (Keller J., concurring); *Stopher v. Commonwealth*, 57 S.W.3d 787, 808–17 (Ky.2001) (Keller, J., dissenting).

Interestingly, the Alabama Supreme Court, which invoked *Martinez–Salazar* to deny a peremptory challenge to a criminal defendant in *Dailey*, 828 So.2d at 344, and to a medical malpractice plaintiff in *Bethea v. Springhill Mem'l Hosp.*, 833 So.2d 1, 6–7 (Ala.2002), balked when a trial judge erroneously denied five challenges for cause by General Motors in a products liability action, thereby requiring the company to use five of its nineteen peremptory challenges to excuse those jurors. *Gen. Motors Corp. v. Jernigan*, 883 So.2d 646, 672–73 (Ala.2003). In that circumstance, the court held that General Motors's rights had been "substantially impaired." *Id.* Sound familiar? Does that mean that un-

der the regime of *Martinez–Salazar*, appellate courts will evaluate on a case-by-case, party-by-party basis the number of peremptory challenges that must be lost, or the type of case in which they were lost, or the type of litigant who lost them, in order to determine whether a litigant's "substantial rights" are impaired? Does it make a difference whether the aggrieved party is a criminal defendant or a medical malpractice plaintiff who lost one peremptory challenge, or a giant corporation that lost five?

Although the majority opinion purports only to overrule *Thomas v. Commonwealth* (while; curiously, concluding that *Thomas* was rightly decided because, like General Motors, the defendant was prejudiced too much), it has, in fact, overruled our entire judicial history with respect to peremptory challenges in civil and criminal[27] cases. In doing so, the majority opinion has effectively delegated the allocation of peremptory challenges to trial judges, the motivations of the vast majority of whom are undoubtedly exemplary. However, I believe that the determination of the proper allocation of peremptory challenges should remain in the hands of appellate courts where the whims of one "compliant, biased or eccentric" judge, *Duncan v. Louisiana*, 391 U.S. at 156, 88 S.Ct. at 1451, if one there be, cannot alone deprive a litigant of his or her substantial right to the peremptory challenges allowed by law. I believe our historical treatment of the right to the peremptory challenges allotted by law as a substantial right is both correct and a matter of *stare decisis*. It took the General Assembly fifty-five years (1877–1932) to abrogate our prede-

---

27. Except for the period from 1877 to 1932 when our predecessor court inexplicably continued to apply provisions of the Criminal Code that had been repealed and the period from 1991 to 1993 when this Court inexplica-

bly held that the denial of peremptory strikes was harmless error because peremptory strikes were not guaranteed by the Constitution. *Dunbar*, 809 S.W.2d at 853, *abrogated by Thomas*, 864 S.W.2d at 258–60.

cessor court's erroneous denial of a criminal defendant's right to the peremptory strikes guaranteed by law. Today, this Court has not only returned to those "dark ages," it has compounded the error by applying the denial in a way that affects both civil and criminal litigants, whether plaintiff or defendant, person or corporation. Hopefully, it will not require another fifty-five years to correct this egregious error.

Accordingly, I dissent.

JOHNSTONE, J., joins this opinion.

LAMBERT, C.J., joins in the legal analysis set forth in this opinion.

Dissenting opinion by Justice JOHNSTONE.

I respectfully dissent from that part of the majority opinion holding that Appellant was not prejudiced by the testimony of Sheriff Cooper and D.C. I believe that the cumulative effect of their testimony denied Appellant a fair trial. I further dissent from the majority's opinion with respect to the peremptory challenges issue and join Justice Cooper's dissent on that issue.

### Sheriff Cooper's testimony

The majority concludes that because the camouflage bag and its contents were admitted without objection, it was subject to fair, and apparently unfettered, comment. I disagree.

The bag, found during a search of Appellant's residence, contained miscellaneous items including twine, lighter fluid, a deck of cards, an empty address book, pens and pencils, glow sticks, military rations, Tabasco sauce, and a magnifying glass. On direct examination, the prosecutor specifically asked Sheriff Cooper if he had a term for such a bag, to which the Sheriff responded that it was a "rape kit."

At that point, defense counsel moved for a mistrial, which was denied. During cross-examination, defense counsel attempted to mitigate the situation by delving further into Sheriff Cooper's characterization of the bag. The sheriff explained that he had recently attended a seminar where he learned that the bag and the items found inside could be used to "stalk someone." Sheriff Cooper conceded, however, that two important items, a camera and binoculars, were not found inside the bag, nor was the bag in Appellant's possession at the time of his arrest. Further, Sheriff Cooper agreed that the items were consistent with those often found in a hunting or fishing bag.

Although the Commonwealth focuses on the fact that defense counsel requested a mistrial rather than an admonition, I must agree with Appellant that an admonition would not have cured the prejudicial effect of Sheriff Cooper's reference to a "rape kit." Further, I wholly disagree with the majority opinion that simply because this was not a rape case, any mischaracterization of the bag's contents was harmless and did not contribute to Appellant's convictions. On the contrary, Sheriff Cooper's testimony, considered in conjunction with D.C.'s testimony, amounted to error which clearly affected Appellant's substantial rights and denied him a fair trial. RCr 9.24.

### D.C.'s Testimony

During direct examination by the Commonwealth, D.C. testified that on the night in question, Appellant told her that he had been in her house on at least one prior occasion and that, in fact, he had been in "hundreds of houses in Ballard County." Defense counsel objected and again requested a mistrial. The trial court denied the motion, but advised the prosecutor that if "[D.C.] popped her mouth one more

time," they would be trying the case again. Nonetheless, several minutes later, D.C. made a second reference to Appellant having been in hundreds of other houses, although the prosecutor attempted to cut her off midsentence.

During cross-examination, defense counsel asked D.C. whether she was aware that Appellant had been in her residence prior to the night in question. D.C. responded that she did not actually know whether he had been in her trailer, only that he told her so. Again, D.C. told the jury that Appellant said he had been in "hundreds of houses in Ballard County." In overruling defense counsel's objection to this third reference, the trial court ruled that counsel had opened the door by asking D.C. whether she knew Appellant had previously been in her trailer. I disagree. Defense counsel's question was limited solely to D.C.'s knowledge of whether Appellant had previously been in *her* residence, not that of anyone else.

The Commonwealth argues, and the majority agrees, that because Appellant refused the trial court's offer of an admonition, he cannot now be heard to complain of any error. I am of the opinion, however, that an admonition would have only further exacerbated the error by drawing attention to D.C.'s statement, made not once, but *three times* during her testimony.

Although the Commonwealth agreed prior to trial not to introduce any evidence of other crimes or bad acts, testimony that Appellant had allegedly entered other houses in Ballard County unquestionably falls within the arnblt of KRE 404(b). "[E]vidence of criminal conduct other than that being tried is admissible only if probative of an issue independent of character or criminal predisposition, and only if its probative value on that issue outweighs the unfair prejudice with respect to character."

*Billings v. Commonwealth*, 843 S.W.2d 890, 892 (Ky.1992); *see also Bell v. Commonwealth*, 875 S.W.2d 882 (Ky.1994). Even more damaging is the fact that there was *no* evidence to support a claim that Appellant had illegally entered other houses in Ballard County. Thus, D.C.'s testimony had absolutely no probative value, and served only to inflame the jury and further prejudice Appellant.

Interestingly, after the jury had returned its verdict, the trial court explained in open court several of the evidentiary rulings that had been made. With respect to D.C.'s testimony, the trial court commented:

I had taken the position that knowing most of you, that you've got sense enough to know that you've got to take everything that you do here on the proof, whatever the proof is, not somebody's opinion of whether it had been 100 houses or two houses or five houses. There's no consequence. The issue was whether or not this boy broke into the mobile home of [D.C.] and did what the proof here indicates that he did. That's all. Whether he had been peeping into a bunch of other homes and houses or broke into them had nothing whatsoever to do with it. Did that have any effect on any of you? Or did any of you even notice that statement?

One juror did respond that he [or she] had taken note of D.C.'s statement.

Admittedly, I am perplexed by the majority's conclusion that this was not KRE 404(b) evidence, but rather evidence of intimidation as a form of restraint under KRS 509.010. The majority analogizes this case to *Gilbert v. Commonwealth*, 838 S.W.2d 376 (Ky.1991), wherein we held that evidence pertaining to the defendant's use of alcohol, marijuana, and pornographic movies was relevant to showing how he forced his step-daughters to engage in

adult sexual activity. Here, the majority opines that Appellant told D.C. that he had entered hundreds of houses in Ballad County to control and intimidate her. Thus, the majority concludes that Appellant's statement was as much of a weapon as the shotgun and knife he used to restrain D.C. I vehemently disagree.

The majority fails to recognize that there was absolutely no evidence that Appellant had actually entered other houses in Ballard County or, quite frankly, that he even made the alleged statement to D.C. Furthermore, the Commonwealth clearly did not offer Appellant's statement as evidence of a "tool of domination" or "mental restraint," as posited by the majority. Simply put, D.C.'s testimony was unsolicited, irrelevant, and certainly prejudicial. Moreover, D.C.'s testimony, coupled with Sheriff Cooper's testimony, created the inference that Appellant was a habitual stalker and potential rapist, a characterization that was not supported by the evidence presented at trial. Because the Commonwealth introduced no other evidence of Appellant's alleged activities, the testimony in question must be deemed reversible error.

LAMBERT, C.J., and COOPER, J., join this dissenting opinion.